FOURTH DIVISION
August 7, 2008

No. 1-07-0679

| | | |
|---|---|---|
| CHICAGO'S PIZZA, INC., CHICAGO'S BEST, INC., and FLOVIG, INC., | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 03 CH 2044 |
| CHICAGO'S PIZZA FRANCHISE LIMITED USA, f/k/a Pizza USA, Inc., and IRFANULLAH MUHAMMED, | ) ) ) ) | Honorable Barbara Disko, Judge Presiding. |
| Defendants-Appellees.) | ) | |

JUSTICE MURPHY delivered the opinion of the court:

Plaintiffs, Chicago's Pizza, Inc., Chicago's Best, Inc., and Flovig, Inc., filed a complaint against defendants, Chicago's Pizza Franchise Limited and Irfanullah Muhammed, alleging that defendants used the Chicago's Pizza name to mislead consumers, benefit from plaintiffs' investment in the Chicago's Pizza name, and divert sales from plaintiffs' restaurants to defendants'. After a bench trial, the trial court found that plaintiffs did not meet their burden of proving that defendants' actions caused plaintiffs to lose revenue.

## I. BACKGROUND

Martin Flores and his wife opened their first Chicago's Pizza restaurant in 1991. By 2002, they had three Chicago's Pizza locations in Chicago: 3114 North Lincoln Avenue, 3006 North

Sheffield, and 1919 West Montrose. From 2002 until 2006, Muhammed ran an unaffiliated Chicago's Pizza pizzeria, with its sole location at 5062 North Sheridan Road. Although Muhammed had only one store, his ads listed multiple "locations," some of which corresponded with plaintiffs' locations. The ads also described worldwide locations and claimed that defendants' restaurant had been in existence since 1970, even though Muhammed did not open the restaurant until 2002.

Certain of plaintiffs' restaurants were called Chicago's Pizza, while others went by Chicago's Pizza & Pasta. Plaintiffs' logo was a red oval with the word "Chicago's" written inside, with either "Pizza" and "Pizza & Pasta" under the oval. Defendants' logo was a red, white, and blue pizza with "Chicago's Pizza" written in the bottom, blue portion and "Pizzeria" written in green in the middle.

Plaintiffs filed a 10-count complaint alleging that defendants used the Chicago's Pizza name in an effort to mislead the public into thinking that it was a franchised business affiliated with plaintiffs. Plaintiff Chicago's Pizza, Inc., the Lincoln Avenue location, alleged tortious interference with business expectancy and violations of the Uniform Deceptive Trade Practices Act (Deceptive Trade Practices Act) (815 ILCS 510/1 *et seq.* (West 2004)) and the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2004)). Chicago's Best, the Montrose Avenue location, and Flovig, the Sheffield Avenue location, alleged violations of the Deceptive Trade Practices Act against both defendants.

In 2006, the case proceeded to trial, where the following evidence was presented.

A. Martin and Patricia Flores

No. 1-07-0679

Martin Flores testified that he owns four locations of Chicago's Pizza: North Lincoln, North Sheffield, West Montrose, and West Irving Park. At the time of trial, the Irving Park location had just been opened, and his West Wilson store relocated to Montrose two years before. The Lincoln store opened in 2001.

Chicago's Pizza was incorporated in 1992 and started as a two-person operation. Sales increased every year, and at the time of the trial, the business had 160 employees. However, at the end of 2002 or 2003, Flores saw a decrease in sales, especially in the Wrigley Field area. Until that time, other competitors opened in the area, but they did not affect his business. He believed that the decrease in business was a result of the opening of a Chicago's Pizza on Sheridan Road, which was not affiliated with his restaurants. He received hundreds of complaints from customers about the quality of the Sheridan restaurant's food.

Furthermore, in February and March 2006, people began complaining that plaintiff was fraudulently charging their credit cards; however, plaintiffs did not charge their credit cards, and the alleged customers were not in plaintiffs' computer system.

Plaintiffs' tax records showed that gross sales for the Lincoln location was $1.9 million for the 2000 tax year; $2.3 million for 2001; $2,078,765 for 2002; $1.8 million for 2003; and $2,296,000 for 2004. During the time frame when he noticed a decrease in sales, he increased his advertising to recover some of the customers he had lost. Sales increased when defendants' restaurant closed in 2006.

In 2000, Flores changed the name of the restaurant on his menus and the Internet to Chicago's Pizza & Pasta. When he opened his first full-service restaurant in Lincoln in 2001, the

-3-

name on the sign was Chicago's Pizza & Pasta. The signs at the Wilson and Sheffield locations have always been Chicago's Pizza, and the sign on Montrose was Chicago's Pizza & Pasta beginning in 2003.

Patricia Flores, Martin's niece, testified that until the year before, she worked at the Chicago's Pizza location on Montrose. At one point, a customer presented a coupon for what purported to be Chicago's Pizza, which listed one phone number for "downtown area, Lincoln area" and "Lincoln Park, Sheffield area" and another number for "Wilson area, Montrose location" and "Rogers Park, Sheridan area." Patricia testified that this coupon was not for plaintiffs' Chicago Pizza. After receiving additional complaints, she called the phone number that the customer gave her for a Chicago's Pizza located on Sheridan. Patricia asked the person who answered the phone whether the restaurant was affiliated with the Chicago's Pizza on Montrose, and he said yes.

Patricia testified that when the Montrose store was opened in 2002, the sign placed outside said Chicago's Pizza & Pasta, as did the menus. However, they always answered the phone "Chicago Pizza."

### B. Defendant Irfanullah Muhammed

Irfanullah Muhammed testified that he bought the goodwill of an existing pizzeria named Paisan's Pizza for $87,000 and changed the name. He did not examine the books and records for the business before purchasing it, and his only experience with the pizza business was observing his friend's pizza business in Japan for three or four months.

At the time he incorporated his business in 2002, Muhammed told the State that he would

be doing business under the name Chicago Pizza Inn U.S.A. However, he never opened a business named Chicago Pizza Inn U.S.A. When he opened his business under the name Chicago's Pizza, he did not look in the phone book to determine whether any other businesses were already using that name. For a short time in 2004 the business was dissolved for failure to pay the franchise fee, but he continued to run it. When he reincorporated in 2004, he learned that he could not use the name Pizza U.S.A. and instead tried to use the name Chicago Pizza & Pasta. He ultimately closed the business in February or March 2006.

Defendants' ads had either a "circle R" next to "Chicago's Pizza," as if it were registered, or the "TM" designation. Muhammed never obtained a registration; he abandoned his application with the United State Patent and Trademark Office.

Although defendants only had one location, on Sheridan Road, their ads included multiple "locations," with different phone numbers for each. For example, defendants' phone book ad and one of their menus[1] showed locations for Lincoln/Sheffield, Downtown/Loop, Montrose/Wilson, and Lakefront/Sheridan/Loyola, and urged customers to "call for your nearest location." In a Yellow Book coupon, defendants listed one phone number for "Downtown Area, Lincoln Area, Lincoln Park, Sheffield Area" and a second number for "Wilson Area, Montrose Location, Rogers Park, Sheridan Area." Another ad had six phone numbers for different areas that were not labeled "locations": Lincoln Park, Sheffield area, Montrose/Wilson, Downtown, UIC & Loop, and Sheridan & Loyola. Muhammed testified that his ads had different phone numbers for different "locations" to avoid overwhelming one phone line and so that the order could be assigned to

---

[1] Two other menus included in the record do not list the multiple "locations."

drivers who delivered in particular areas. He denied that he was trying to create the impression that his restaurant had multiple locations.

Several of defendants' ads or menus listed worldwide locations, including Dubai, Frankfurt, Rome, and New York. Muhammed admitted that these locations did not exist, but he wanted to open franchises in New York and Tokyo. His friend was going to open a location in San Francisco and his brother was going to open one in Washington, D.C.

Certain ads or menus also made reference to "Established 1970" and "Since 1970" or provided, "Thanks to all Wonderful Customers for their Continued Support towards the Prosperity of Chicago's Pizza Since 1970." As Muhammed did not open the restaurant until 2002, the restaurant was not established in 1970. He testified that the year 1970 refers to when a restaurant called Strawberry Pizza, located in Japan, began using a particular crust recipe.

Certain ads also state that defendants' restaurant is open until 5 a.m. Muhammed testified that the restaurant's closing time was 5 a.m. but was changed to 3 a.m. During the time when a 5 a.m. closing time was advertised, sometimes he closed earlier.

Muhammed testified that he first learned of plaintiffs' restaurants after this lawsuit was filed. In response, he put up a sign visible to both the public and the employees that answered the phone saying that the restaurant was not affiliated with any other locations or companies. Employees answered the phone "Chicago's Pizza Sheridan," and he instructed them that if any customers asked about Chicago's Pizza & Pasta, "tell them to call different numbers."

Muhammed testified that plaintiffs' and defendants' restaurants carry different items. For example, Muhammed testified that his pizzeria did not carry 40% of the appetizers listed on

plaintiffs' menu, and he did not sell any of plaintiffs' salads, chicken dishes, wraps, or gourmet sandwiches. They sold different desserts, and defendants carried Pepsi products, while plaintiffs carried Coke products. In addition, halal food, which plaintiffs do not sell, constituted 20 to 30% of defendants' gross sales.

Muhammed testified that after this litigation ends, he plans to reopen his business under the name "Chicago's Pizza."

### C. Customers

#### 1. *Wolf Stern*

Wolf Stern testified that he ordered pizzas about once a month from plaintiffs' Lincoln Avenue location. In December 2003, he decided to order a pizza and looked in the Yellow Pages for the Chicago's Pizza on Lincoln Avenue. When he could not find it, he called the Chicago's Pizza on Sheridan and asked for the phone number of the Lincoln Avenue location. The person Stern spoke to asked him for his address and said they could deliver from the Sheridan location, so Stern placed an order. Stern's understanding was that he was ordering from an affiliate of the Chicago's Pizza on Lincoln. When the pizza did not arrive within the agreed-upon period of time, Stern called the location two or three times and was told that the driver was right around the corner. He had to wait almost two hours for the delivery to arrive, and the pizza he bought was "terrible." Stern called the store again to express his dissatisfaction, and the man he talked to offered him a discount on his next order, which would be placed in the computer system and honored at all of their locations, including Lincoln Avenue.

In 2004, Stern met Martin Flores when Flores threw a party for their sons' baseball team

at Chicago's Pizza. Flores told him about issues he was having with another store with a similar name, and Stern explained the problem he had in December 2003. In the meantime, Stern had stopped ordering from Chicago's Pizza and had told his friends of his negative experience. After speaking to Flores, Stern again began patronizing the Chicago's Pizza on Lincoln Avenue.

### 2. *Travis Cohen*

Travis Cohen testified that for two years until February 2006, he ordered pizza from the Sheffield location of Chicago's Pizza at least once a week. In February 2006, he looked in the phone book, which had multiple locations for Chicago's Pizza. Because he knew that Sheffield turned into Sheridan, he thought that the Sheridan location was the same as the Sheffield location. Therefore, he ordered a pizza from the Sheridan location. He testified that Chicago's Pizza charged his debit card $22.12 for this order, but another charge for $55 appeared on his account two days later. Cohen called the Sheridan location regarding the extra charge and was advised to call Maria, the area manager for Chicago's Pizza. Cohen called Maria at the number that the person at the Sheridan location gave him and discovered that the two locations were not affiliated. Cohen filed a police report and filed a grievance with his bank. After this incident, he is ordering pizzas again from the Sheffield location.

### 3. *Anthony Poole*

Anthony Poole testified that in February 2005, he saw an ad for Chicago's Pizza and called the number listed to order a pizza. He had ordered from the Montrose and Wilson locations of Chicago's Pizza at least 12 times. When the pizza arrived, the quality was different, but he assumed there was a new person in plaintiffs' kitchen. A few weeks later, he ordered

another pizza by using the phone number from the same ad. He asked the employee on the phone whether this was the location on Wilson, and the employee responded that it was. When the pizza arrived, the packaging and aroma were different from normal, so he asked the deliveryman what location it came from. The deliveryman said the Chicago's Pizza on Sheridan. Poole told him to take the pizza back and called the Sheridan location. He spoke to the same person as before and questioned him on the discrepancy between locations. The employee responded that he told Poole earlier that they deliver to the Wilson area, not that the location was on Wilson Avenue. After this incident, he is ordering pizzas again from the Montrose and Wilson locations.

### 4. *Joseph Bitterman*

Joseph Bitterman testified that he was a customer of the Chicago's Pizza on Sheffield beginning in late 2004. In July 2005, he looked in the phone book and saw an ad for Chicago's Pizza, with different phone numbers for each of its four locations: Lincoln/Sheffield, Downtown/Loop, Montrose/Wilson, and Lakefront/Sheridan/Loyola. The ad listed a toll-free number to call "for your nearest location" and represented that the pizzerias were open until 5 a.m. Bitterman called the Sheffield location believing he was calling the Chicago's Pizza he had done business with on Lincoln and Sheffield. The food he received was "disgusting to say the least," but when he called the store at 4 a.m. to complain, it was closed. The following day, he returned the food to the Chicago's Pizza on Sheffield, from which he thought he had ordered, but did not believe the employees when they told him that they had not made the sandwich. He disparaged the store to 20 or 30 people before he learned that he had ordered from a Chicago's Pizza on Sheridan.

### 5. *Judith Levine*

Judith Levine testified that she has been patronizing the Wilson and Montrose locations of plaintiffs' Chicago's Pizza for 15 years. In April 2005, she clipped a Yellow Book coupon for Chicago's Pizza with three phone numbers--one for "Lincoln Park and Sheffield areas," one for "Wilson and Montrose areas," and a third for "Sheridan and Broadway areas." She believed that the coupon was for plaintiffs' restaurants, since it had the same name and the locations listed on the coupon were similar to plaintiffs' locations, so she attempted to use it at plaintiffs' Montrose location. Plaintiffs' Montrose location informed her that the coupon was not theirs but still honored it.

### 6. *Mary DeArmond*

Mary DeArmond testified that she was referred to the Chicago's Pizza on Montrose. In the summer of 2005, her friend searched in his cell phone for the nearest Chicago's Pizza. A number of Chicago's Pizza locations came up, but her friend called the location on Sheridan because it was the closest to his house. Her friend placed an order, and when she went to pick it up, she asked whether the restaurant was affiliated with the Chicago's Pizza on Montrose. The employee said that it was. Since then, she has not ordered from the Sheridan location, but she has ordered from the Montrose location several times.

### D. Accountant Sam Remer

Sam Remer, an accountant, testified that he was retained by Martin Flores to determine whether defendants' actions damaged plaintiffs' business and the amount of lost revenue. He reviewed Chicago's Pizza, Inc.'s (the Lincoln location) tax returns for 2000 through 2004 and

spoke to Martin Flores, his assistant, and his accountant. Remer did not review any other financial records of plaintiffs'. He concluded that the Lincoln location's sales declined in 2002 and 2003 but increased somewhat in 2004. He estimated that lost sales for 2002 and 2003 were $830,000 and its lost profits were $500,000. The carry-out and delivery portions of the business sustained the majority of the losses. Flores told him that a number of delivery drivers had to be laid off.

Although the Lincoln Avenue dining room opened in 2001, Remer testified that Martin Flores told him that it did not open until 2002. Believing that the Lincoln Avenue's dining room was an extra source of income in 2002 that the business did not have in 2001, Remer added $250,000 to the difference between the numbers for 2001 and 2002. Therefore, of the $830,000 he estimated in lost sales for those two years, $250,000 was attributable to the dining room income that he believed plaintiffs had in 2002 but not in 2001. Remer agreed that if there was a dining room operating in 2001, his numbers "would have to be changed." Remer testified that before he learned that the dining room revenue needed to be added to the damages calculation, he had concluded that plaintiffs' lost sales "appeared to be minimal."

Remer opined that defendants' actions caused these losses. Based on his research, the depositions of Muhammed, his brother, and a driver, Remer concluded that there was a concerted effort to cause confusion between the two establishments.

Defendants' tax return for 2002 showed sales of $30,000 a year, or approximately $100 a day. Remer discounted the tax return, however, because it contradicted the deposition testimony of Muhammed, his brother, and a driver, who stated that the daily sales were between $2,000 and

$4,000 a day. He also identified mathematical errors in the return and stated that the gross profit ratio was understated. No employees were shown on the tax returns for 2002 and 2003; apparently defendants' employees were paid in cash. Defendants' business records were not provided to Remer, who considered the tax returns to be fraudulent.

Remer did not know the geographic area that plaintiffs' Lincoln Avenue store delivered to, nor did he know how many other business had a pizza delivery business within the same area. He discounted other area businesses' contribution to any decrease in plaintiffs' sales based on what Martin Flores told him. He also relied on *Pizza Today Magazine*'s conclusion that national pizza consumption had not changed much in the last 15 years.

### E. Trial Court's Decision

At the close of plaintiffs' case, defendants moved for a directed finding, which the trial court denied. The trial resumed; defendants did not call any witnesses but did present exhibits. The trial court found that Muhammed was not truthful in his advertising, including his use of the trademark designation and his claims of being established in 1970 and having restaurants in foreign countries; however, the trial court "fails to see how this false advertisement hurt Plaintiff's business." Furthermore, although Martin Flores testified that his business was injured because defendants had "such an inferior product," "if Muhammed had a better product, he may have been more serious competition. Bad pizza will not survive in Chicago; there is too much competition. Flores apparently does have a very good product and have very loyal customers at each of his restaurants. However, in the very competitive food business, he could lose them for any number of reasons." The trial court concluded that plaintiffs failed to meet their burden of proving that

No. 1-07-0679

defendants interfered with the business in such a manner as to cause lost revenue. Therefore, it found for defendants on all counts.

Plaintiffs' motion for new trial was denied, and this appeal followed.

II. ANALYSIS

A. Manifest Weight of the Evidence

The standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence. *Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177 (2004). A reviewing court will not substitute its judgment for that of the trial court in a bench trial unless the judgment is against the manifest weight of the evidence. *First Baptist Church of Lombard v. Toll Highway Authority*, 301 Ill. App. 3d 533, 542 (1998). "A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001).

As the trier of fact, the trial judge was in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony. *Buckner v. Causey*, 311 Ill. App. 3d 139, 144 (1999). When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent. *Buckner*, 311 Ill. App. 3d at 144.

1. *Denial of directed finding*

Plaintiffs first contend that the trial court erred by entering judgment in favor of

defendants when it denied their motion for directed finding pursuant to section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2004)) and defendants did not present any evidence during their case. Defendants argue that the evidentiary record before the trial court at the time of the motion for directed finding was not the same as the record before the court after trial because at the close of trial, the court considered all of the evidence, "including the testimony of Defendants' witnesses, Defendants' exhibits, and the written findings of fact and conclusions of law presented by both parties." As plaintiffs point out, defendants did not present any witnesses, and the exhibits they submitted duplicated plaintiffs' trial exhibits, with the exception of defendants' exhibits 7, 8,[2] and 9, which were substantially similar but not the same.

Plaintiffs cite *Geske v. Geske*, 343 Ill. App. 3d 881 (2003), in support of their argument. In *Geske*, at the close of the plaintiff's case, the defendant presented a motion for directed finding, which the trial court denied. The defendant rested without presenting any evidence, and the trial court found for the defendant. On the first appeal, the court found in an unpublished order pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23) that the trial court erred by entering judgment in the defendant's favor because when the defendant rested without offering any additional evidence, the initial determination that the plaintiff had satisfied his required burden of proof was unchallenged. *Geske*, 343 Ill. App. 3d at 883. On remand, the trial court, citing its previous application of an incorrect standard, denied the plaintiff's motion for entry of judgment in her favor and ruled in favor of the defendant. On a second appeal, the court affirmed the trial

---

[2] While plaintiffs argue that defendants' exhibit 8 corresponds to plaintiffs' exhibits 4 and 5, exhibit 8 is missing from the record.

court's decision to reopen the motion and correct its prior ruling. *Geske*, 343 Ill. App. 3d at 885.

Unlike the defendant in *Geske*, who did not present *any* evidence, defendants here submitted their trial exhibits, even if most were the same as plaintiffs'. Therefore, the trial court's initial determination that plaintiffs satisfied their burden of proof was not "unchallenged," as it was in *Geske*. See *Geske*, 343 Ill. App. 3d at 883. Furthermore, defendants' exhibits 7 and 9, while similar to plaintiffs' exhibits, are not identical to them. Although plaintiffs claim that defendants' exhibit 8 duplicates their exhibits, that exhibit is missing from the record, and the omission must be construed against plaintiffs. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984) (an appellant has the burden of presenting a sufficiently complete record of proceedings at the trial court level to support a claim of error, and a reviewing court will resolve any doubts arising from the incompleteness of the record against the appellant).

*Bruss v. Klein*, 210 Ill. App. 3d 72 (1991), is instructive. In *Bruss*, the defendants presented a motion for directed finding at the close of the plaintiff's case, which the trial court denied. The defendants called one witness to the stand, and following the trial, the trial court entered judgment for the defendants. On appeal, the plaintiff argued that the trial court's ruling in favor of the defendants was against the manifest weight of the evidence because by denying the motion for directed finding, the trial court found that he met his burden of proof. The court noted that, in ruling on a defendant's motion for directed finding, a trial court must first determine whether the plaintiff made out a *prima facie* case. *Bruss*, 210 Ill. App. 3d at 77-78, citing *Kokinis v. Kotrich*, 81 Ill. 2d 151, 155 (1980). If a *prima facie* case exists, then the trial judge must consider all the evidence, pass on the credibility of witnesses, draw reasonable inferences from the

testimony, and consider the weight and quality of the evidence. *Bruss*, 210 Ill. App. 3d at 78. If the weighing process results in the negation of some of the evidence necessary to the plaintiff's *prima facie* case, the court should grant the defendant's motion and dismiss the action. *Bruss*, 210 Ill. App. 3d at 78.

"We do not agree with plaintiff's argument, however, that the court's ruling in the motion for a directed finding must be considered a determination that plaintiff's testimony was credible and that his case was thus proved, precluding a judgment for defendants at the conclusion of the trial." *Bruss*, 210 Ill. App. 3d at 78. The court noted that if a defendant's motion is denied, the court should continue as if the motion had not been made and proceed with trial. *Bruss*, 210 Ill. App. 3d at 78, citing *Kokinis*, 81 Ill. 2d at 155. "The fact that the trial court did not grant either of defendants' motions does not mean that the court could not rule for defendants at the conclusion of the trial, even based on a ground raised in the motions." *Bruss*, 210 Ill. App. 3d at 78.

Therefore, we find that the trial court's denial of the motion for directed finding did not cause its final judgment to be against the manifest weight of the evidence.

### 2. *Tortious interference with business expectancy*

Plaintiffs also contend that the trial court's finding that Chicago's Pizza, Inc. failed to prove tortious interference with business expectancy was against the manifest weight of the evidence. This tort recognizes that a person's business relationships constitute a property interest and, as such, are entitled to protection from unjustified tampering by another. *Miller v. Lockport Realty Group, Inc.*, 377 Ill. App. 3d 369, 373 (2007). The elements of the tort of intentional

interference with a business expectancy include (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference. *Mannion v. Stallings & Company, Inc.*, 204 Ill. App. 3d 179, 188 (1990). A cause of action for intentional interference with a business expectancy need not be based on an enforceable contract that is interfered with; rather, it is the interference with the relationship that creates the actionable tort. *Lusher v. Becker Brothers, Inc.*, 155 Ill. App. 3d 866, 869-70 (1987).

Plaintiffs first argue that they proved a reasonable expectancy of maintaining and entering into business relationships with existing and new customers. Specifically, they had a reasonable expectancy of maintaining business relationships with Stern, Poole, Cohen, and other customers deceived by defendants, and of entering into a new business relationship with DeArmond.

The trial court found that while Flores apparently had a good product and loyal customers, "in the very competitive food business, he could lose any of them for any number of reasons." Similarly, defendants, citing *Intervisual Communications, Inc. v. Volkert*, 975 F. Supp. 1092 (N.D. Ill. 1997), argue that offering proof of a past customer relationship is not sufficient to prove a reasonable expectation of a future business relationship. In *Intervisual*, the court stated that the first element requires the plaintiff to "specifically identify [third] parties who actually contemplated entering into a business relationship with him." *Intervisual*, 975 F. Supp. at 1103. If a plaintiff were not required to specifically identify parties who actually contemplated entering into a business relationship with him, " 'liability under a theory of tortious interference with

prospective business expectancies would be virtually without limit and impossible to calculate.' "
*Intervisual*, 975 F. Supp. at 1103, quoting *Celetex Group, Inc. v. Executive Gallery*, 877 F.
Supp. 1114, 1125-26 n.19 (N.D. Ill. 1995).

It is clear that Wolf Stern contemplated a business relationship with plaintiffs, as he called
defendants' store and asked for the phone number of the Lincoln Avenue location. The person
Stern spoke to asked for his address and said they could deliver from the "Sheridan location."
When he ordered from defendants, he believed he was doing business with plaintiffs. Jason
Bitterman also ordered from defendants, believing he was doing business with the Chicago's Pizza
on Lincoln and Sheffield. Furthermore, this court has previously ruled that "the opportunity to
obtain customers is an expectancy protected by the tort of interference with a business
expectancy." *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d
524, 529 (1989), citing *North Broadway Motors, Inc. v. Fiat Motors of North America, Inc.*, 622
F. Supp. 466, 1117 (N.D. Ill. 1984). See also Restatement (Second) of Torts §766B, Comment
*c*, at 22 (1979) (one type of protected relation is "interference with a continuing business or other
customary relationship not amounting to a formal contract").

Second, the name of defendants' restaurant and their advertising campaign suggest the
defendants' knowledge of the expectancy. Also, defendants deceived customers Stern,
DeArmond, Poole, and Cohen into thinking they were an affiliate of plaintiffs'.

Plaintiffs contend that they satisfied the third element, the defendant's intentional and
unjustified interference that prevents the realization of the business expectancy. To prevail, it is
insufficient for a plaintiff to merely show that the defendant interfered with a business expectancy.

Rather, "[t]he element of 'purposeful' or 'intentional' interference refers to some impropriety committed by the defendant in interfering with the plaintiff's expectancy." *Romanek v. Connelly*, 324 Ill. App. 3d 393, 406 (2001); Restatement (Second) of Torts §766B, Comment *a*, at 20 (1979). Plaintiffs must prove that defendants acted "intentionally with the aim of injuring" plaintiffs' expectancy. *Romanek*, 324 Ill. App. 3d at 406. While "one may not simply sue any competitor who lures away customers, *** the privilege of competition is not available to those who use wrongful means to interfere." *Downers Grove Volkswagen*, 190 Ill. App. 3d at 528.

Plaintiffs argue that defendants intentionally and unjustifiably prevented plaintiffs' realization of doing business with Stern, DeArmond, Poole, and Cohen by allowing them to place orders with defendants and then lying to Poole and DeArmond about the affiliation. While the trial court found that defendants used a distinctive logo on their advertising, we disagree with their argument that Bitterman and Cohen simply mistook defendants' ad for plaintiffs'. Defendants' ads represented that they had numerous locations when they only had one. Two of the four locations (Downtown/Loop, Lakefront/Sheridan/Loyola) described in several of defendants' ads did not match plaintiffs'; however, two others (Lincoln/Sheffield, Montrose/Wilson) corresponded with plaintiffs' Lincoln, Sheffield, and Montrose stores.

The fourth element is damages resulting from the interference. *Mannion*, 204 Ill. App. 3d at 188. "Although the amount of an award of lost profits need not be proven with absolute certainty, the plaintiff bears the burden of proving such damages with reasonable certainty." *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 284 Ill. App. 3d 417, 426-27 (1996). Plaintiffs contend that they suffered damages because defendants diverted four specific orders, and Stern

refused to do his usual weekly business with plaintiffs for one year. They also cite Remer's testimony that plaintiffs' lost sales for 2002 and 2003 exceeded $730,000 and their lost profits were $500,000. Significantly, plaintiffs do not challenge any of the trial court's specific findings as to damages. The trial court concluded that plaintiffs did not meet their burden of proving that defendants interfered with their business in such a manner to cause them to lose revenue.

Regarding the diversion of specific orders, as the trial court found, each witness testified that he or she returned to ordering from plaintiffs. Furthermore, the only customer to testify as to defendants' actions during 2002 and 2003, the time when plaintiffs alleged, and their expert testified to, diminished sales, was Stern.

Furthermore, the trial court rejected Remer's testimony because he did not conduct an independent investigation as to changes in the industry, the area of the city, or of people's eating habits at the time of the alleged decline in revenue. In addition, Remer accepted Flores's explanation as to lost revenues. While Remer testified that defendants' records were inaccurate and that his gross sales must have been $800,000 a year, the trial court doubted whether defendants earned that much if the food was as bad as plaintiffs' witnesses testified it was.

In addition, Remer's initial figures were based on erroneous assumption that Lincoln dining room did not open until 2002, when in fact it opened in 2001. Remer agreed that if there was a dining room operating in 2001, his numbers "would have to be changed," but he did not testify as to what that change would be. He also testified that before he learned that the dining room revenue needed to be added to the damages calculation, he had concluded that plaintiffs' lost sales "appeared to be minimal." We find that the trial court's conclusion as to damages was

not against the manifest weight of the evidence.

Therefore, we conclude that plaintiffs failed to demonstrate that the trial court's findings as to tortious interference with business expectancy were against the manifest weight of the evidence.

### 3. *Deceptive Trade Practices Act*

Plaintiffs argue that they are entitled to injunctive relief and attorney fees because defendants violated the Deceptive Trade Practices Act. The purpose of the Deceptive Trade Practices Act is to prohibit unfair competition, and it is primarily directed toward acts that unreasonably interfere with another's conduct of his or her business. *Phillips v. Cox*, 261 Ill. App. 3d 78, 81 (1994). "Unfair competition is a broader concept than trademark infringement and depends upon likelihood of confusion as to the source of plaintiff's goods when the whole product, rather than just the service mark, is considered." *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill. App. 3d 99, 113 (1984); *Phillips*, 261 Ill. App. 3d at 81. A plaintiff may be granted relief under the theory of unfair competition regardless of whether his product or service is in direct competition with the defendant's product or service. *Thompson*, 126 Ill. App. 3d at 113.

In relevant part, section 2 of the Deceptive Trade Practices Act provides:

"A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

(1) passes off goods or services as those of another;

(2) causes likelihood of confusion or of misunderstanding as to the

-21-

No. 1-07-0679

source, sponsorship, approval, or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;

(4) uses deceptive representations or designations of geographic origin in connection with goods and services;

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

***

(8) disparages the goods, services, or business of another by false or misleading representation of fact;

(9) advertises goods with intent not to sell them as advertised;

***

(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2(a) (West 2004).

In order to prevail under section 2, "a plaintiff need not prove *** actual confusion or misunderstanding." 815 ILCS 510/2(b) (West 2004).

The trial court found that plaintiffs did not prove that defendants' conduct caused their lost revenue, a finding that we concluded is not against the manifest weight of the evidence. However, the Deceptive Trade Practices Act does not require proof of "monetary damages, loss

of profit, or intent to deceive" to merit injunctive relief. 815 ILCS 510/3 (West 2004). In fact, plaintiffs cannot seek damages under the Deceptive Trade Practices Act. *Empire Home Services*, 274 Ill. App. 3d at 671; *Greenberg v. United Airlines*, 206 Ill. App. 3d 40, 46 (1990). Rather, a "person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable." 815 ILCS 510/3 (West 2004); *Greenberg*, 206 Ill. App. 3d at 47. See *Disc Jockey Referral Network, Ltd. v. Ameritech Publishing of Illinois*, 230 Ill. App. 3d 908, 915 (1992) ("Private suits for injunctive relief may be brought in situations where one competitor is harmed or may be harmed by the unfair trade practices of another"). In *Bingham v. Inter-Track Partners*, 234 Ill. App. 3d 615, 621 (1992), the court held that "injunctive relief is warranted when a party's trade practice creates a likelihood of confusion of misunderstanding."

Defendants argue that they did not "pass off" their goods and services as those of plaintiffs because the words "Chicago's Pizza" are generic and descriptive of the parties' location and goods. They also point out that they prominently display their distinctive logo on their advertising, menus, and telephone book listings.

We disagree with defendants and conclude that plaintiffs demonstrated that defendants' trade practices created a likelihood of confusion or misunderstanding. Specifically, defendants' trade practices (1) cause the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods and services, in violation of subsection 2(a)(2); (2) cause the likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another, in violation of subsection 2(a)(3); and (3) use

deceptive representations or designations of geographic origin in connection with goods and services, in violation of subsection 2(a)(4). See *Multiut Corp. v. Draiman*, 359 Ill. App. 3d 527, 537 (2005). Defendants have also engaged in "any other conduct which similarly creates a likelihood of confusion or misunderstanding," in violation of subsection 2(a)(12). 815 ILCS 510/2(a)(12) (West 2004).

In addition to the similar name, defendants' menus, coupons, and ads falsely advertised numerous locations, even though they only had one. The ads urged customers to "call for your nearest location" and had different numbers for the different "locations." These phone numbers corresponded to each of the phony locations, so defendants appeared to have locations in different parts of the city. Two of defendants' "locations" (Lincoln/Sheffield, Montrose/Wilson) corresponded to plaintiffs' locations on Lincoln, Sheffield, and Montrose/Wilson. Adding to the confusion, many of the ads and coupons that touted multiple "locations" did not have defendants' own address on them.

While defendants blame the customers for their own alleged "mistakes," it was defendants' ads that caused their confusion. Indeed, plaintiffs proved not only a *likelihood* of confusion or misunderstanding as a result of defendants' ads and coupons, as required by the Deceptive Trade Practices Act, but also *actual* confusion by customers. See *Thompson*, 126 Ill. App. 3d at 113. For example, Anthony Poole, an established customer of plaintiffs', testified that defendants' employee told him he was ordering from the Wilson "location," when plaintiffs, not defendants, had a restaurant on Wilson. Similarly, Wolf Stern, also a regular customer of plaintiffs', called defendants because he wanted the phone number for the Lincoln Avenue location. Stern

specifically testified that when he ordered a pizza, he believed he was doing business with an affiliate of plaintiffs'. When he called defendants to complain about the poor quality of the food, an employee offered him a discount, which would be good at the Lincoln Avenue "location," even though plaintiffs, not defendants, had a restaurant on Lincoln Avenue. Mary DeArmond also testified that one of defendants' employees told her that their restaurant was affiliated with the Chicago's Pizza on Montrose.

Similarly, Joseph Bitterman saw an ad for Chicago's Pizza with different phone numbers for different locations. Bitterman called the number for the Sheffield "location" believing he was calling plaintiffs' restaurant on Sheffield and placed an order. Judith Levine, a customer of plaintiffs' for 15 years, believed that defendants' coupon, which listed three "locations," was for plaintiffs' restaurants until she attempted to use it. Finally, Patricia Flores testified that she called a phone number on one of defendants' ads and was advised that it was affiliated with the Chicago's Pizza on Montrose. Martin and Patricia Flores also testified that they received a number of customer complaints regarding defendants' products, even though they were not plaintiffs'.

In *Phillips*, the plaintiffs bought the defendant's sign-making business, which included both real and personal property and the right to use the name "David Cox Signs." Six years later, the defendant opened a sign-making business next door to the plaintiffs and named his business "David R. Cox d/b/a Sign Design and Construction." The plaintiffs filed a complaint for injunctive relief, claiming that the defendant diverted the plaintiffs' customers, thereby depriving them of sales and revenue. The complaint was dismissed. On appeal, the court applied the

"broad language" of subsection 2(12) of the Deceptive Trade Practices Act and noted that any conduct that creates a likelihood of consumer confusion or misunderstanding is potentially actionable under subsection 2(12), even if the conduct is not specifically covered by other sections of the act. *Phillips*, 261 Ill. App. 3d at 81-82. The court held that the plaintiff alleged facts sufficient to state a cause of action because (1) the defendant located his sign-making business next door to the plaintiffs' business, (2) both parties were engaged in the same type of business, and (3) the defendant was operating his business under a name that is "very similar" to the name used by the plaintiffs. *Phillips*, 261 Ill. App. 3d at 83.

Similarly, in *Empire Home Services*, the plaintiff's advertising emphasized a telephone number, 588-2300, which generated more than 1,000 responses a day. The defendant began using the phone number 588-3200, and when some potential Empire customers mistakenly phoned the defendant, told the customers that they reached Empire, or a company "just like Empire." The defendant referred the customers to Carpet America, which contacted the caller and claimed to be Empire, using a sales presentation and purchase orders similar to Empire's. The court ruled that the complaint stated a claim under subsections 2(1), (2), and (3) of the Deceptive Trade Practices Act. *Empire Home Services*, 274 Ill. App. 3d at 670.

While *Phillips* and *Empire* involved the sufficiency of complaints rather than the sufficiency of the proof at trial, they demonstrate the type of conduct that this court has found violative of the Deceptive Trade Practices Act. Defendants used a similar name, and their ads advertised numerous locations, some of which corresponded to plaintiffs' locations on Lincoln, Sheffield, and Montrose/Wilson. In light of the evidence of defendants' ads, menus, and coupons,

and the potential for customer confusion, we find that plaintiffs demonstrated that defendants violated section 2 of the Deceptive Trade Practices Act. Furthermore, although defendants' restaurant is currently closed, Muhammed testified that after this litigation ends, he plans to reopen his business he plans to reopen his business under the name "Chicago's Pizza," thus perpetuating the potential for confusion. Therefore, we find that plaintiffs are entitled to injunctive relief. 815 ILCS 510/3 (West 2004); *Empire Home Services*, 274 Ill. App. 3d at 671; *Greenberg*, 206 Ill. App. 3d at 46.

In addition, costs or attorney fees may be assessed against a defendant "only if the court finds that he has wilfully engaged in a deceptive trade practice." 815 ILCS 510/3 (West 2004). "Willful" is defined as "voluntary and intentional, but not necessarily malicious." Black's Law Dictionary (8th ed. 2004). Muhammed denied knowing about plaintiffs' restaurants until this lawsuit was filed in 2003. Even assuming that to be the case, the uncontroverted customer testimony was that defendants continued to mislead consumers about their association with plaintiffs' restaurants after the complaint was filed. Therefore, we find because defendants "wilfully engaged in a deceptive trade practice," plaintiffs are entitled to reasonable attorney fees.

### 4. *Consumer Fraud Act*

Plaintiff Chicago's Pizza, Inc., also alleged a violation of the Consumer Fraud Act. Section 2 of the Consumer Fraud Act provides that the use of any practice described in section 2 of the Deceptive Trade Practices Act also constitutes a violation of the Consumer Fraud Act. 815 ILCS 505/2 (West 2004). While plaintiffs are entitled to injunctive relief under the Deceptive Trade Practices Act, the same does not apply for Chicago's Pizza, Inc.'s claim for violation of the

Consumer Fraud Act.

Section 10a(c) of the Consumer Fraud Act provides that "in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate." 815 ILCS 505/10a(c) (West 2004). We have previously held that the "Consumer Fraud Act provides a private cause of action only where a plaintiff can show that he suffered damage as a result of unlawful conduct proscribed by the statute." *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 859 (1995). Although "a *violation* of the Consumer Fraud Act may occur in the absence of damages, a *private cause of action* does not arise absent a showing of both a violation and resultant damages." (Emphasis in original.) *Tarin v. Pellonari*, 253 Ill. App. 3d 542, 554 (1993). We find that Chicago's Pizza, Inc.'s failure to prove actual damages, as described above, precludes damages or injunctive relief under the Consumer Fraud Act.

### B. Discovery

Finally, plaintiffs contend that the trial court precluded them from engaging in complete discovery concerning defendants' financial and business records and the identity of their customers. A trial court has great latitude in ruling on discovery matters. *Mutlu v. State Farm Fire & Casualty Co.*, 337 Ill. App. 3d 420, 434 (2003). A trial court's rulings on such matters will not be disturbed absent a manifest abuse of discretion. *Mutlu*, 337 Ill. App. 3d at 434.

Plaintiffs argue that the trial court erred when it denied them access to defendants' "financial and business records" and computer-based customer lists. Plaintiffs do not, however, cite to pages of the record for their requests or the trial court's denial. Indeed, it is unclear what requests plaintiffs are referring to. Therefore, we consider this argument waived. 210 Ill. 2d R.

No. 1-07-0679

341(h)(7); *Feret v. Schillerstrom*, 363 Ill. App. 3d 534, 541 (2006).

### III.  CONCLUSION

Plaintiffs have failed to demonstrate that the trial court's findings as to their claims for tortious interference and consumer fraud are against the manifest weight of the evidence. However, we find that plaintiffs are entitled to injunctive relief and attorney fees pursuant to the Deceptive Trade Practices Act.  Therefore, we reverse in part and remand for entry of injunctive relief and a determination as to reasonable attorney fees.

Affirmed in part and reversed in part; cause remanded.

CAMPBELL and O'BRIEN, JJ., concur.

No. 1-07-0679

| | |
|---|---|
| Please Use Following Form: | |
| Complete TITLE of Case | CHICAGO'S PIZZA, INC., CHICAGO'S BEST, INC., and FLOVIG, INC., <div align="right">Plaintiffs-Appellants,</div> v. <br><br> CHICAGO'S PIZZA FRANCHISE LIMITED USA f/k/a PIZZA USA, INC., and IRFANULLAH MUHAMMED, <div align="right">Defendants-Appellees.</div> |
| Docket No. <br><br> COURT Opinion Filed | No. 1-07-0679 <br> Appellate Court of Illinois <br> First District, FOURTH Division <br><br> August 7, 2008 <br> (Give month, day and year) |
| JUSTICES | JUSTICE MICHAEL J. MURPHY delivered the opinion of the court: <br> Campbell, and O'Brien, JJ.,        concur. <br><br> dissents. |
| APPEAL from the Circuit Court of Cook County, Illinois. | Lower Court and Trial Judge(s) in form indicated in the margin: <br><br> Honorable Barbara Disko, Judge Presiding |
| For APPELLANTS, John Doe, of Chicago. <br><br> For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel) | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. <br><br> **FOR APPELLANTS:**     Craig D. Tobin, Tomas Petkus <br> Tobin, Petkus & Munoz LLC, <br> Three First National Plaza, Suite 1950, Chicago, IL 60602 <br> Phone: 312-641-1321 |
| Also add attorneys for third-party appellants or appellees. | **FOR APPELLEES:**     Steven J. Hampton, Ronald A. DiCerbo, Michael J. Krautner <br> McAndrews, Held & Malloy, Ltd. <br> 500 W. Madison Street, 34th Floor, Chicago, IL 60661 <br> Phone: 312-775-8000 <br><br><br> (USE REVERSE SIDE IF NEEDED) |