2023 IL App (1st) 221146-U

THIRD DIVISION
May 10, 2023

No. 1-22-1146

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| MAGDALENA WIERZBICKI, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 18 L 12191 |
| URSZULA BRUS, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Sandra Ramos, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court's judgment in favor of plaintiff was not against the manifest weight of the evidence; (2) the trial court's damages award for pain and suffering and loss of a normal life was not against the manifest weight of the evidence; (3) defendant forfeited her claim that the trial court abused its discretion in granting plaintiff's motion *in limine* by failing to comply with Supreme Court Rule 341(h)(7); and (4) the trial court did not abuse its discretion in denying defendant's motions *in limine* to bar the admission of plaintiff's medical bills.

¶ 2    In November 2018, plaintiff Magdalena Wierzbicki filed a complaint alleging battery and negligence against defendant Urszula Brus and seeking damages in excess of $50,000 for each

count. Following a June 2022 bench trial, the trial court entered judgment in favor of plaintiff on both counts and awarded damages in the amount of $225,138.88, comprised of $175,138.88 in medical bills, $25,000 for pain and suffering, and $25,000 for loss of a normal life.

¶ 3 Defendant appeals, arguing that: (1) the trial court's judgment in favor of plaintiff was against the manifest weight of the evidence; (2) the awards of $25,000 for pain and suffering and $25,000 for loss of a normal life were against the manifest weight of the evidence; (3) the trial court abused its discretion in granting plaintiff's motion *in limine* to exclude evidence of the family situations and history between the parties; and (4) the trial court abused its discretion in denying defendant's motions *in limine* allowing medical bills into evidence without a proper foundation.

¶ 4 We observe that defendant's statement of facts fails to adhere to Supreme Court Rule 341(h)(6), which requires the brief "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018). Defendant's statement of facts is a little over one page long and consists of four paragraphs. Rather than fully detailing the evidence presented at trial, the statement of facts offers a general summary and provides an incomplete recitation of the proceedings in the trial court. While defendant does discuss some facts in her argument, the recitation does not offer a full account without comment.

¶ 5 In November 2018, plaintiff filed her complaint alleging one count of battery and one count of negligence against defendant. Plaintiff's claims arose out of an alleged assault by defendant that occurred at the wake for Teresa Brus, defendant's mother. Plaintiff alleged that on January 11, 2018, she and defendant were at the funeral home when defendant "without provocation willfully and wantonly" committed a battery upon plaintiff when defendant

"violently struck the plaintiff in the shoulder with [her] fist and/or hand, injuring the plaintiff's shoulder." As a result of the assault and battery, plaintiff claimed she was injured and suffered damages. Plaintiff further alleged that defendant had a duty to exercise ordinary care not to cause injury to plaintiff, but notwithstanding her duty, defendant "negligently and carelessly" struck plaintiff in the shoulder with her fist and/or hand injuring plaintiff's shoulder, which had been the object of a recent surgery.

¶ 6        Prior to trial, the parties filed multiple motions *in limine*. One of plaintiff's motions requested the following:

> "That the Defense counsel not be allowed to discuss any of the family situations involved with the Plaintiff such as her granddaughter Vanessa Brus or her daughter except for the relationship between the deceased Teresa Brus as the grandmother of the granddaughter Vanessa Brus as a reason to be at the wake."

The trial court granted plaintiff's motion to exclude testimony of the family relationships.

¶ 7        One of defendant's motions *in limine* moved to "exclude from evidence plaintiff's unpaid medical bills as there [was] no expert medical testimony as to the charges being reasonable." In a related motion, defendant also sought to bar the use of the business records affidavits to admit plaintiff's medical bills into evidence. The trial court denied both motions on the record and in a written order.

¶ 8        The following evidence was presented at the June 2022 bench trial.

¶ 9        Plaintiff, with the assistance of a Polish interpreter, testified she was born in Poland and had lived in the United States for over 30 years. She is a widow with one daughter and three granddaughters, including Vanessa Brus. Vanessa's father is Grzegorz Brus. Defendant is Grzegorz's sister and their deceased mother was Teresa Brus.

¶ 10 Plaintiff had two surgeries on her left shoulder in 2017. The first surgery occurred in February 2017 after plaintiff had been struck by a motorcycle. The second surgery took place in August 2017 following a fall off a bed with Vanessa. In January 2018, plaintiff was in physical therapy at Athletico.

¶ 11 Plaintiff was in contact with Teresa because Teresa would care for Vanessa. At some point, plaintiff's daughter informed her that Teresa had cancer. On January 9, 2018, plaintiff found out in a text message that Teresa had passed away. She did not know who sent the text message. Plaintiff found Teresa's obituary online including the information for the wake. Plaintiff was taking care of Vanessa and wanted to take her to the wake. She planned to take Vanessa's picture at the wake to memorialize the event. Vanessa was 18 months old in January 2018.

¶ 12 On January 11, 2018, plaintiff had physical therapy at Athletico and then proceeded to Teresa's wake with Vanessa and a friend, Jan Romanowski. They arrived at the funeral home at 8:55 p.m., shortly before the wake ended. She was directed to the room for the visitation and did not see anyone in the room. Plaintiff was carrying Vanessa with her right arm. She walked straight to the casket and placed a small bouquet of flowers in Teresa's hands. Plaintiff took four photographs of Vanessa next to the casket. She denied placing Vanessa on the casket. She wanted to take a picture of Vanessa with her grandmother Teresa. Plaintiff estimated that she spent four or five minutes in front of the casket. When she turned around, she saw a few people in the room.

¶ 13 As plaintiff was leaving the wake, defendant "stormed" into the room and started swearing at plaintiff. Defendant then struck plaintiff "very hard" on her left shoulder. Plaintiff was still holding Vanessa in her right arm. Plaintiff felt "a very severe pain" and Vanessa began

to cry. Then defendant's cousin joined defendant and both women were hitting plaintiff and Vanessa. Plaintiff was struck under her breast area. She could not recall the name of defendant's cousin. Another woman, Sylwia Rybaltowska, had previously called plaintiff about the services, but at the wake, she joined in striking plaintiff. Rybaltowska bumped into plaintiff and said, "What the f*** are you doing here, b****?" The attack happened a few steps from the door. She was unable to defend herself because she was holding Vanessa. The assault lasted a few seconds.

¶ 14 An employee from the funeral home approached plaintiff and plaintiff asked her to call the police, but the employee pushed her out of the funeral home. The employee told plaintiff she could go to the police station. Plaintiff then went to the police station and made a police report. She was feeling "very strong pain" in her left shoulder.

¶ 15 The next day, plaintiff went to her previously scheduled physical therapy appointment. She was still in pain and described what had happened the day before to her therapist. The therapist told her that they would stop physical therapy. After the assault, plaintiff was unable to comb her hair, wash herself, or use a knife or a spoon with her left arm. She had to use her right arm.

¶ 16 Plaintiff had an appointment on January 27, 2018, with her doctor, Dr. Ellis Nam and he ordered X-rays and an MRI. Following the MRI, Dr. Nam informed plaintiff that she needed another surgery for a rotator cuff tear. Dr. Nam subsequently performed the surgery on April 4, 2018. Following the surgery, plaintiff resumed physical therapy at Athletico. She was feeling better but felt pain after the surgery for "quite a long time."

¶ 17 According to plaintiff, she had seen defendant once prior to January 2018 when she picked up Vanessa from Teresa's house. Two police officers, Teresa, and Romanowski were also present at that time. Defendant told plaintiff that whenever plaintiff needed, she could count on

defendant. Plaintiff went to the house because the police asked her to take care of Vanessa. She did not see defendant again until January 2018. Plaintiff did not consider defendant a good person because she did not show any interest or have any contact with Vanessa.

¶ 18    Jan Romanowski testified that he was retired and had known plaintiff for over 40 years. He was born in Poland and moved to the United States about 45 years ago. He met plaintiff when he first came to Chicago. He was living in Florida, but in January 2018, he came to Chicago to help plaintiff because she could not drive and needed help with transportation while she cared for Vanessa. He also helped her when she had surgery. He took care of the house and drove her to doctor visits and physical therapy. By the end of 2017, she could do everything on her own, including cooking and cleaning. According to his testimony, plaintiff was doing "very well" in terms of pain.

¶ 19    On January 11, 2018, Romanowski drove plaintiff to her physical therapy and then later to the funeral home. At 8:55 p.m., he dropped plaintiff and Vanessa off at the front door and he drove away to park. He then proceeded to the entrance of the funeral home. He noticed several people standing close to the door. Romanowski walked up to the visitation room and saw plaintiff and Vanessa near the casket. He did not see anyone else in the room at that time. He stood to the right of the door because he did not like to look at "dead people." He saw plaintiff take pictures with her cell phone and pray. He never saw plaintiff place Vanessa onto the casket or attempt to lay her into the casket with the deceased. Plaintiff then turned towards the exit. They were quiet in the room out of respect. A woman in a chair near the entrance door asked plaintiff about Vanessa and plaintiff told the woman that Vanessa was Teresa's granddaughter. Romanowski stayed near the door for them to exit.

¶ 20    While plaintiff was speaking with this woman, Romanowski saw plaintiff being attacked. He identified defendant in court as the person he saw attacking plaintiff. Defendant was swearing and "slapped" plaintiff's left shoulder. Defendant said, "What are you doing here, b****, w****?" The slap was "a hard hit, and it made [plaintiff] stagger and sway." A second woman came up and also started to hit plaintiff. Romanowski later learned the second woman was defendant's cousin. He described it as a "brutal, aggressive attack" that happened "very quickly." He thought plaintiff would have fallen down because she was holding Vanessa in her other arm, but he thought someone helped plaintiff from behind. The woman from the funeral home asked plaintiff to leave because the other women did not want plaintiff there. Plaintiff asked her to call the police, but the woman declined and told her to go to the police station.

¶ 21    When they got to the car, it took some time to "shake off the shock of the incident." Plaintiff told him her left shoulder was very painful. They went to a police station and plaintiff recounted what had happened. He estimated that they were at the police station for 30 to 40 minutes.

¶ 22    The next day, Romanowski drove plaintiff to physical therapy at Athletico. Plaintiff was in a great deal of pain and could not use her left arm. Plaintiff was having problems feeding herself, bathing, and getting dressed. He extended his stay in Chicago to help plaintiff and drove her to doctor's appointments.

¶ 23    Dr. Ellis Nam testified that he is a board certified orthopedic surgeon. He discussed his treatment of plaintiff from August 2017 through September 2018. He performed surgery on plaintiff's left shoulder on August 18, 2017, for a rotator cuff repair. Following the surgery, plaintiff was referred to physical therapy at Athletico. Dr. Nam estimated plaintiff's recovery

7

from that surgery would have been at least six to nine months. In January 2018, plaintiff was approximately five months post-surgery.

¶ 24    Dr. Nam testified it was possible that plaintiff's shoulder could have been susceptible to further injury if she was struck in that shoulder. In his opinion, the assault "could very well have contributed to *** her retear of her rotator cuff." The records from Athletico on January 12, 2018, indicated that plaintiff told the physical therapist that she attended a funeral the previous night and "was physically attacked by her son-in-law's family as she held her granddaughter."

¶ 25    Dr. Nam saw plaintiff on January 17, 2018, and his notes stated that plaintiff presented with a left shoulder injury after she was "attacked" on January 11, 2018, in which others "shook and shoved her." After that appointment, Dr. Nam ordered an MRI for imaging of plaintiff's shoulder. He reviewed the films and observed a "massive retear of [plaintiff's] rotator cuff." He had an extensive conversation with plaintiff about her treatment options, including leaving it alone and a reverse shoulder replacement. He did not feel a repeat attempt at a repair would be viable. After their discussion, the plan was for surgery on April 4, 2018.

¶ 26    The April 2018 surgery was a reverse total shoulder replacement. Dr. Nam described the surgery as a reverse shoulder replacement because the implant was the ball in the shoulder socket. Following the surgery, Dr. Nam conducted follow-up visits monthly through September 2018. Plaintiff also continued her physical therapy through September 2018.

¶ 27    Dr. Nam testified that the treatment rendered after January 11, 2018, was reasonable and necessary. He stated that it would be reasonable to conclude, within a reasonable degree of orthopedic certainty, that the incident on January 11, 2018, was a contributing cause of plaintiff's injuries after that date. Dr. Nam further testified that it was reasonable to conclude that any rough

physical contact with plaintiff's left shoulder while in recovery from the prior surgery would have made her susceptible to the injury he treated following January 11, 2018.

¶ 28    Dr. Nam also identified bills for his treatment of plaintiff beginning after January 17, 2018. He testified that the bills were for usual and customary treatment of plaintiff. His records included several office visits, the MRI, and surgery.

¶ 29    During cross-examination, Dr. Nam discussed his first surgery performed on plaintiff in February 2017 for left shoulder pain resulting from a rotator cuff tear. He had discussed with plaintiff that there was higher risk of failure due to the tear. Plaintiff required the second surgery after a fall out of bed in which she retore her rotator cuff. In August 2017, he operated on plaintiff's left shoulder a second time. In his January 2018 examination, Dr. Nam observed weakness in plaintiff's shoulder and arm pain with range of motion. He did not observe any bruises and the skin appeared normal. According to Dr. Nam, if someone were to grab an operative shoulder and shake or shove it, it could cause a retear of the rotator cuff after someone had a massive tear. On redirect, Dr. Nam testified that plaintiff's August 2017 surgery was the result of falling out of a bed following her first shoulder surgery. Plaintiff was also susceptible to reinjuring her shoulder in January 2018. He did not perform the same surgery in April 2018 as in August 2017 because he thought it was highly unlikely to work a third time. The bills for Dr. Nam's services were admitted without objection.

¶ 30    Erica Hardman testified that she was employed with the corporate office of Athletico Physical Therapy. She works as a compliance specialist and oversees the medical records department as well as the release of information and corrections to their documentation. She identified an exhibit consisting of an affidavit of records billing and various medical bills for plaintiff incurred at Athletico. The invoices were transmitted to Hardman in the regular course of

business as a regularly conducted activity. The records were made at or near the time that services were provided to plaintiff. The records covered services between June 2018 and September 2018. According to Hardman, the charges for medical care were usual and customary for the medical services provided. Hardman stated that the amount from June 26, 2018 through September 11, 2018 was $5803. Hardman admitted that she did not prepare the bills and does not work in accounting. The trial court admitted the bills for services provided by Athletico, over defendant's objection.

¶ 31    Mary Jo Evans works as a business analyst with Ascension Illinois. She is familiar with the usual and customary medical charges for Presence Resurrection Medical Center and Presence Saint Joseph Hospital. She identified her signature on an affidavit of records. The affidavit detailed an itemized statement of the services and charges for care rendered by the Presence providers for plaintiff in February 2018 and April 2018. She testified that these records are kept by Presence in the regular course of a business as a regularly conducted activity. The records were transmitted to her in the regular course of business by someone with personal knowledge and the records were made at or near the time the services were provided. The total billed amount for the Presence Resurrection Medical Center was $19,813.42 and the total billed from Presence Saint Joseph Hospital was $136,570.46. Evans admitted that she did not prepare the bills. She can tell what kind of treatment plaintiff received by looking at the bills, but did not personally treat plaintiff. At the conclusion of Evans's testimony, the trial court admitted the affidavit of records and bills for services provided, over defendant's objection.

¶ 32    After plaintiff rested her case, defendant moved for a directed finding, which the trial court denied.

¶ 33    Defendant testified that Teresa was her mother. She was familiar with plaintiff and had seen her once prior to January 11, 2018, when plaintiff picked up her granddaughter from defendant's house. Nothing unusual happened at that time. She never had a conversation with plaintiff prior to January 11, 2018. Defendant notified plaintiff via text message that Teresa had passed away through Teresa's phone. She used her mother's phone because she did not have contacts for her mother's friends. Teresa passed away on January 7, 2018.

¶ 34    The wake took place from 3 to 9 p.m. on January 11, 2018. Many people attended throughout the day. At around 9 p.m., defendant was present with her son, her aunt, her cousin Sylwia Rybaltowska, Grazyna Kaminska, and Mariusz Marcinek. There were a few other people present, but defendant did not know their names. She stated that seven people were present. Right before 9 p.m., defendant was in the front room, about 10 steps away from the casket. She was standing in the room.

¶ 35    Plaintiff arrived before 9 p.m. The family was about to line up near the casket for the last prayer of the day when plaintiff entered the room. Plaintiff walked straight to the casket with her granddaughter. Plaintiff placed the baby on the coffin and started taking pictures. Defendant heard plaintiff say something and assumed it was a prayer. Plaintiff also placed a flower in Teresa's hands. Defendant testified that plaintiff was trying to place the baby on the coffin to take a picture of the child sitting on it. The family stood near the casket for plaintiff to finish paying her respects. As plaintiff was walking away, she became loud and "seemed upset that nobody informed her when or where the wake was." Defendant stated that she told plaintiff that they were saying the last goodbyes to her mother and they wanted to do it peacefully. Defendant did not wish for any type of situation or commotion to happen in that room. Defendant then turned and walked back to the coffin. Defendant did not follow plaintiff nor did she see anybody

else following plaintiff. Defendant denied seeing Romanowski in the room. She denied striking, pushing, or touching plaintiff. She also denied hitting plaintiff's left arm. She was not aware that plaintiff had a problem with her left arm. She did not see anyone else hit or push plaintiff.

¶ 36    Sylwia Rybaltowska testified that defendant is her cousin. She did not know plaintiff prior to January 2018. Teresa was her aunt and Rybaltowska attended the wake on January 11, 2018. She was present for the entire wake. Shortly before 9 p.m., Rybaltowska was in the room for Teresa's wake with her husband Mariusz Marcinek, her mother, defendant, defendant's son, Grazyna Kaminska, and Kaminska's mother. Defendant was standing by the casket. Rybaltowska saw plaintiff enter the visitation room. She knew the person who entered was plaintiff because she recognized Vanessa. She did not see anyone else with plaintiff. Rybaltowska saw plaintiff walk to the casket and take pictures. According to Rybaltowska, plaintiff tried to sit Vanessa on the casket and to lay the baby in the casket, but Vanessa did not cooperate. Rybaltowska thought plaintiff's actions with Vanessa were inappropriate. No one tried to interrupt plaintiff and no one approached her while she was taking the pictures.

¶ 37    Rybaltowska testified that those at the wake made a comment to plaintiff that her behavior was inappropriate as plaintiff was exiting the room. Plaintiff then raised her voice and began yelling things, such as nobody had informed her of the wake. No one else spoke to plaintiff. Rybaltowska followed plaintiff to ensure that plaintiff left the funeral home. Marcinek, Rybaltowska's husband, went to find an employee to ask plaintiff to leave. Rybaltowska testified that plaintiff was standing in the hallway making threats, including that "she will do us in." Plaintiff then left. Rybaltowska denied hitting plaintiff and did not see anybody else hit plaintiff or yell at her.

¶ 38     Grazyna Kaminska testified that she had been friends with Teresa and attended her wake on January 11, 2018. She was in the room for Teresa's wake just before 9 p.m. She saw plaintiff enter the room with a baby in her arm and walk straight up to the casket. Plaintiff was in the visitation room for five minutes. Kaminska did not see anyone strike plaintiff in the visitation room. She did not see anyone with plaintiff in the visitation room.

¶ 39     Mariusz Marcinek testified that he is married to Rybaltowska and was present at Teresa's wake on January 11, 2018. He observed plaintiff arrive close to the end of the wake. She had a baby in her arms. Marcinek was present the entire time plaintiff was at the wake. He did not see a fight or anyone strike plaintiff at the wake. He was still there when plaintiff left. He admitted to speaking with defendant in the hallway that morning before the trial began.

¶ 40     Following the parties' closing arguments, the trial court entered its findings and judgment. The court gave an extensive summary of the facts of the case. In its summary, the court observed that plaintiff's exhibits included photographs of Vanessa "near the casket, not on the casket" and being held by plaintiff in one hand while plaintiff took the photograph with the other hand. It appeared to be the pew area in front of the casket, but it was not clear from the photographs. On June 24, 2022, the trial court entered her written order, stating: "Judgment is hereby entered in Favor of the Plaintiff, Magdalena Wierzbicki, and against the defendant, Urszula Brus, in the total amount of $225,138.88.

¶ 41     This appealed followed.

¶ 42     Defendant first argues that the trial court's judgment in favor of plaintiff was against the manifest weight of the evidence. Specifically, defendant contends that the record does not support the trial court's determination of damages and the court "failed to apply its common sense to the evidence presented." According to defendant, the trial court was swayed by her

sympathy for plaintiff's granddaughter Vanessa rather than the relevant evidence presented in the case. In response, plaintiff maintains that the trial court had ample evidence in the record to support her judgment. Defendant did not file a reply brief on appeal.

¶ 43    When an award of damages is made after a bench trial, we review whether the trial court's judgment is against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). A judgment is against the manifest weight of the evidence only if the opposite conclusion is clear or where the trial court's findings appear to be unreasonable, arbitrary, or not based on evidence. *Id*. "A reviewing court will not substitute its judgment for that of the trial court in a bench trial unless the judgment is against the manifest weight of the evidence." *Id*.

¶ 44    As the trier of fact, the trial judge was in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony. *Id*. "When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent." *Id*. "An award of damages is not against the manifest weight or manifestly erroneous if there is an adequate basis in the record to support the trial court's determination of damages." *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13.

¶ 45    Plaintiff's complaint had alleged battery and negligence by defendant in the assault at the funeral home. While defendant argues that the weight of the evidence shows that the battery never occurred, she fails to cite any authority regarding the elements of civil battery or negligence. Illinois Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July

14

1, 2008). It is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff v. Dever*, 194 Ill. App. 3d 147, 155-56 (1990). This reviewing court is " 'not a repository into which an appellant may foist the burden of argument and research.' " *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1098 (2007) (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993)). Rather, the only relevant authority cited by defendant related to the standard of review.

¶ 46     It is not this court's role to create an appellate argument, research the issue, and then apply the relevant authority to the facts in order to determine whether the claims have merit. For these reasons, defendant's claim falls well short of Rule 341 and has been forfeited.

¶ 47     Forfeiture aside, defendant's claim lacks merit where the trial court had the ability to view all witnesses and assess their credibility before determining the appropriate judgment award.

¶ 48     "The elements of a claim for civil battery are: (1) an intentional act on the part of the defendant, (2) resulting in offensive contact with the plaintiff's person, and (3) lack of consent to the defendant's conduct." *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 62. "It is the plaintiff's burden to allege and prove all of the elements of a negligence claim, including a duty owed by the defendant, a breach of that duty, and that the breach was the proximate cause of the plaintiff's injuries." *Monson v. City of Danville*, 2018 IL 122486, ¶ 23. "Liability in a personal injury action cannot be based on speculation or conjecture and the burden is on the plaintiff to produce evidence, either direct or circumstantial to show not only that injuries exist, but also that they were the result of the occurrence at issue." *Geers v. Brichta*, 248 Ill. App. 3d 398, 406 (1993). The plaintiff is not required to prove the case beyond a reasonable

doubt or negate entirely that the defendant's conduct was not the cause of the injury. *Id.*

¶ 49    At the conclusion of the trial, the trial court summarized the evidence presented and then made the following findings.

"Now, in light of all that evidence presented, the critical point is, obviously, at the point where the plaintiff, after paying her respects, whether inappropriate or appropriate, taking ahold [*sic*] of the child near her grandmother, who she will never know because she'll never remember, puts flowers in her hands and then proceeds to exit. How is this perceived by all the witnesses is jarring to the Court because *** she was not spoken to. This is a solemn time. It's a funeral. And if the plaintiff was ill-disposed of *** not being notified of the wake and starts talking loudly, certainly a hush, you know, reminder of where she is at would have been enough if indeed that would have happened.

But I heard conflicting stories about what did happen, and I have to determine what the facts are. And here's how I determined them. I determined that there's no relationship or acknowledgment of this tiny precious gift called Vanessa, that this child was being taken care of by the paternal grandmother, then the maternal grandmother. And unfortunately, the paternal grandmother was stricken with cancer and dies.

When being notified of this, Magdalena goes to pay her respects, tried to make herself as little of an issue as possible because, oddly enough, the last time she sees Urszula she is called by the police to pick up this child from the paternal grandmother's home, which is odd to this court. Why would the police be engaged in who would take care of this precious child? Magdalena picks this

16

child up. This is the child that she brings to the funeral home. She's not told about the funeral, but she finds out, and she goes in the least, in her mind possibly, or the least intrusive time near the end of the funeral, which is five minutes or three minutes to 9:00. I'm not going to split hairs on that. And she goes *** directly to the casket, places flowers, takes pictures of the child with her deceased paternal grandmother and tries to exit.

*** [T]he Court finds that she was approached by Urszula. It's not a very big room where the decedent is being waked. No one sees Mr. Romanowski, who's in the back, and he's a tiny man. I'll give you that. And he's -- and he was standing in the back, and this is -- by and large, funeral rooms are very dark, and this picture shows only artificial light, no window light, and it's very dimly lit. He's in the back. That someone doesn't see someone doesn't mean that they're not there. But he was two or three feet from the confrontation.

I believe that Urszula was offended to a great degree that these photos were being taken, to the point where she did approach and not in a non-offensive way. I believe that she meant to call Magdalena, the plaintiff's, attention to what she viewed was inappropriate behavior. I believe that there was an exchange of words given *** what appears to be a lack of interest in this child. I do believe that physical contact was made of an offensive nature by Urszula to the plaintiff.

Urszula is surrounded by family at that location. She contradicts the testimony of her own witnesses. Didn't see [plaintiff] leave. Didn't see anybody leave with [plaintiff] when [defendant's] own witnesses state that they are following [plaintiff] to make sure she leaves while she's being pushed by some

17

attendant of the funeral home and then followed by the husband who, I don't know, maybe muscled behind the woman carrying this child. I don't understand this behavior to make sure she leaves. I don't think you need three people to make sure that an elderly woman with her grandchild leaves.

I do believe that, in contradicting her own testimony, that *** Sylwia also made physical contact. She's not charged, but she assisted Urszula. I do not believe that Grace saw nothing. Nothing ever happened. There was no exchange.

At the very least, she would have seen the exchange where allegedly Urszula, by her own words, the defendant, said I told her my mother should have a peaceable wake, and that's what she wanted. She saw nothing. She knows nothing. She contributes absolutely nothing to what occurred on that date. That physical contact being had.

I now look at the complaint because I do believe that on the date in question, it was not a lack of exercising ordinary care. It was an intentional hitting. She didn't carelessly hit the plaintiff. She intentionally, willfully, and wantonly committed the battery upon the plaintiff of Magdalena Wierzbicki.

So I look at the medical documentation that's provided, the testimony of the doctor, and the bills, and they have the appropriate foundation. And as such, the specialists, as summarized and as used by the Court submitted with their certification and affidavit, I'm awarding the plaintiff *** $175,138.88. That's the extent of -- for bills.

I am also awarding in -- pain and suffering and the loss of [a normal] life. I'm awarding 25,000 as to each of those for a total of 50,000 ***."

18

¶ 50    As the trial testimony shows, this case was essentially a question of credibility between the parties and their witnesses. Plaintiff and Romanowski testified that defendant and Rybaltowska approached plaintiff unprovoked and struck her multiple times as plaintiff was leaving the funeral home. Plaintiff supported her position regarding the assault with the testimony of Dr. Nam, who testified that it was reasonable for the strikes alleged to have caused plaintiff's rotator cuff to tear again. In contrast, defendant and her witnesses testified that no assault occurred.

¶ 51    Defendant contends that the trial court failed to regard her testimony as well as the testimony of her supporting witnesses. She also asserts that the court failed to consider the bias of Romanowski, while disbelieving defendant's witnesses. As discussed above, both sides presented conflicting accounts of the evening. Additionally, the supporting witnesses on both sides had a possible bias towards the respective party. Romanowski was a longtime friend of plaintiff while Rybaltowska was defendant's cousin, Marcinek was Rybaltowska's husband, and Kaminska was a family friend. Thus, the trial court's credibility assessments of the witnesses were crucial to the judgment. "[W]here there are alternative inferences to be drawn from evidence, we accept the view of the trier of fact as long as it is reasonable." *Westlake v. C. House Corp.*, 2011 IL App (1st) 100653, ¶ 23.

¶ 52    Defendant does not argue that plaintiff failed to establish any of the elements for either battery or negligence, but instead contends that her witnesses were more credible than plaintiff's witness. Plaintiff set forth sufficient evidence that defendant committed an intentional act resulting in offensive contact with plaintiff without plaintiff's consent. See *Obermeier*, 2019 IL App (1st) 170553, ¶ 62. Plaintiff also presented evidence that defendant owed her a duty, she breached that duty, and defendant's actions proximately cause of plaintiff's injury to her

shoulder. See *Monson*, 2018 IL 122486, ¶ 23. Since the trial record demonstrates that plaintiff presented evidence to support her claims, we cannot say that the trial court's judgment in her favor was against the manifest weight of the evidence. Accordingly, we decline to vacate the trial court's judgment in favor of plaintiff.

¶ 53    Next, defendant asserts that the trial court's damages award for pain and suffering and loss of a normal life was against the manifest weight of the evidence. Specifically, defendant contends that plaintiff failed to present sufficient evidence to justify the court's award of $25,000 for pain and suffering and $25,000 for loss of a normal life. Defendant also argues that plaintiff failed to plead loss of a normal life in her complaint and did not move to amend her pleadings to conform to the proofs. However, defendant fails to cite any authority regarding damages for pain and suffering, loss of a normal life, or that these damages must be specifically alleged in the pleadings.

¶ 54    As previously stated, Supreme Court Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). It is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff*, 194 Ill. App. 3d at 155-56. This reviewing court is " 'not a repository into which an appellant may foist the burden of argument and research.' " *Stenstrom*, 375 Ill. App. 3d at 1098 (quoting *Obert*, 253 Ill. App. 3d at 682). The only authority cited by defendant relates to the standard of review.

¶ 55    Again, this court is not tasked with developing an appellate argument with relevant authority in order to review defendant's contention. For these reasons, defendant's claim falls

well short of Rule 341 and has been forfeited.

¶ 56    Forfeiture aside, we find no merit in defendant's contention that the trial court's award of damages for pain and suffering and loss of a normal life were manifestly erroneous. Unlike economic damages, such as medical expenses, an award for pain and suffering is not as readily calculable in money and the factfinder must draw on their real life experiences in making an award. *Snover v. McGraw*, 172 Ill. 2d 438, 448-49 (1996) (citing 2 D. Dobbs, Law of Remedies § 8.1(4), at 382 (2d ed.1993)). "An award for pain and suffering is especially difficult to quantify." *Id*. at 448. "In overturning a damage award, a reviewing court must find that the trial judge either ignored the evidence or that its measure of damages was erroneous as a matter of law." *1472 N. Milwaukee, Ltd.*, 2013 IL App (1st) 121191, ¶ 13.

¶ 57    Here, plaintiff presented evidence at trial to support the trial court's damages award for pain and suffering and loss of a normal life. Plaintiff had two previous surgeries on her left shoulder with the most recent occurring in August 2017. Both prior surgeries occurred as a result of a physical injury, her initial shoulder injury happened after she was struck by a motorcycle and the second occurred after she fell from a bed. Neither happened without some intervening issue.

¶ 58    She was still in recovery in January 2018. She went to physical therapy immediately before attending the wake. Her medical records from Athletico on January 11, 2018, indicated that she stated "the shoulder is sore when trying to lift it to shoulder height." The next day, however, the records stated that plaintiff had been "physically attacked" at the wake and that "both shoulders are painful and bothering her and she has some scratches across [left] chest." She shortened her therapy session because she did not want to perform the exercises and was instructed to follow up with her doctor.

¶ 59     In his testimony, Dr. Nam stated that it was possible that plaintiff's shoulder could have been susceptible to further injury if she was struck in that shoulder. In his opinion, the assault "could very well have contributed to *** her retear of her rotator cuff." Dr. Nam saw plaintiff on January 17, 2018, and his notes stated that plaintiff presented with a left shoulder injury after she was "attacked" on January 11, 2018, in which others "shook and shoved her." After that appointment, Dr. Nam ordered an MRI for imaging of plaintiff's shoulder. He reviewed the films and observed a "massive retear of [plaintiff's] rotator cuff." He had an extensive conversation with plaintiff about her treatment options, including leaving it alone and a reverse shoulder replacement. He did not feel a repeat attempt at a repair would be viable. After their discussion, the plan was for was a reverse total shoulder replacement surgery on April 4, 2018.

¶ 60     In Dr. Nam's opinion, it would be reasonable to conclude, within a reasonable degree of orthopedic certainty, that the incident on January 11, 2018, was a contributing cause of plaintiff's injuries after that date. It was also reasonable to conclude that any rough physical contact with plaintiff's left shoulder while in recovery from the prior surgery would have made her susceptible to the injury he treated following January 11, 2018.

¶ 61     Romanowski detailed how he assisted plaintiff and after the assault, he extended his stay to help plaintiff following her injury. The day after the wake, plaintiff was in a great deal of pain and could not use her left arm. He said plaintiff was having problems feeding herself, bathing, and getting dressed.

¶ 62     In contrast, defendant did not present any evidence to rebut plaintiff's evidence of her injuries and their impact on her life. Rather, the defense denied that the assault occurred and no expert was called to counter Dr. Nam.

¶ 63     In closing arguments, plaintiff's counsel contended as follows.

"I want to talk to you about some of the pain and suffering that the plaintiff suffered. Healing from the August 18, 2017, surgery was her last shot at having a rotator cuff repair surgery. You heard Dr. Nam testify that he wasn't going to do a third surgery, that a total shoulder replacement became necessary. After recovering -- after spending four, and almost five months in recovery, she got knocked back to square one. She had to have another surgery.

***

That pain and suffering includes not being able to dress or bathe herself, the pain that she experienced, the increased pain that her document – that's documented in her Athletico records, the increased pain that's documented in Dr. Nam's note of January 17, 2018, the expenses and difficulty of having a total shoulder replacement surgery on April 4, 2018. Those are all expenses that the plaintiff is entitled to recover and that cannot, under the law in Illinois, be reduced on account that she was recovering from surgery."

Plaintiff's counsel requested $75,000 for pain and suffering and $75,000 for loss of a normal life.

¶ 64    In response, defense counsel argued that nothing occurred at the funeral and if anything had happened, it did not cause plaintiff's injuries.

¶ 65    After reviewing the evidence presented, we cannot say that the trial court's award of damages was manifestly erroneous. Plaintiff presented evidence to support her claims for these damages and the trial court weighed that evidence. The court declined to award the full amount requested and instead awarded a third of the request, $25,000 each for pain and suffering and loss of a normal life. Accordingly, defendant's argument fails and we affirm the damages award.

¶ 66    Defendant next raises alleges that the trial court abused its discretion with three of its

rulings on the parties' motions *in limine*. Specifically, she contends that the trial court abused its discretion by: (1) granting plaintiff's motion *in limine* to exclude evidence of the family situations and history; and (2) denying defendant's motions *in limine* that sought to bar plaintiff's evidence of medical expenses without a proper foundation.

¶ 67    "The circuit court is vested with broad discretion to grant a motion *in limine* 'as part of its inherent power to admit or exclude evidence.' " *Hawkes v. Casino Queen, Inc.*, 336 Ill. App. 3d 994, 1005 (2003) (quoting *City of Quincy v. Diamond Construction Co.*, 327 Ill. App. 3d 338, 342-43 (2002)). "Evidentiary motions, such as motions *in limine,* are within the trial court's discretion and are reviewed under an abuse of discretion standard." *Citibank, N.A. v. McGladrey & Pullen, LLP*, 2011 IL App (1st) 102427, ¶ 13. "The trial court abuses its discretion when the ruling is arbitrary or unreasonable or no reasonable person would agree with the position taken by the court." *Id.*

¶ 68    Defendant fails to cite any relevant authority regarding our review of motions *in limine*. While defendant asserts that the trial court abused its discretion, she does not cite any authority regarding the standard of review. Again, Rule 341(h)(7) requires an appellant to include in its brief an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). As pointed out above, it is well-settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 341(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Wasleff*, 194 Ill. App. 3d at 155-56. This reviewing court is " 'not a repository into which an appellant may foist the burden of argument and research.' " *Stenstrom*, 375 Ill. App. 3d at 1098 (quoting *Obert*, 253 Ill. App. 3d at 682). "A court of review is entitled to have the issues

24

clearly defined with pertinent authority cited." *Hawkes*, 336 Ill. App. 3d at 1004.

¶ 69    Defendant's argument on plaintiff's motion *in limine* about the family history does not cite any authority. She argues that plaintiff "opened the door" for the admission of this evidence, but does not support her argument with any citation to case law. Absent any reasoned argument with citation to relevant authority, defendant has not complied with Rule 341(h)(7) and this claim has been forfeited.

¶ 70    We next consider defendant's contention that the trial court abused its discretion in denying her request to bar the admission of plaintiff's medical bills. Defendant has cited case law for this argument. Defendant asserts that no testimony was presented by plaintiff that any of her medical bills were paid or that she was liable to pay them.

¶ 71    An injured plaintiff is entitled to recover reasonable medical expenses. *Klesowitch v. Smith*, 2016 IL App (1st) 150414, ¶ 44. Admission of bills requires evidence that plaintiff necessarily incurred the medical bill because of injuries caused by the defendant's negligence. *Arthur v. Catour*, 216 Ill. 2d 72, 81-82 (2005). A plaintiff may place the entire billed amount into evidence, provided that the plaintiff establishes the proper foundational requirements to show the bill's reasonableness. *Wills v. Foster*, 229 Ill. 2d 393, 414 (citing *Arthur*, 216 Ill. 2d at 81-83).

¶ 72    When evidence is admitted, through testimony or otherwise, that a medical bill was for treatment rendered and that the bill has been paid, the bill is *prima facie* reasonable." (Internal quotation marks omitted.) *Arthur*, 216 Ill. 2d at 82. If the bill has not been paid, a plaintiff "can establish reasonableness by introducing the testimony of a person having knowledge of the services rendered and the usual and customary charges for such services. Once the witness is shown to possess the requisite knowledge, the reasonableness requirement necessary for

admission is satisfied if the witness testifies that the bills are fair and reasonable." (Internal quotation marks omitted.) *Id.*

¶ 73    Defendant contends that the testimony from Hardman, Evans, and Dr. Nam was not sufficient to establish the necessary foundation for the admission of plaintiff's medical bills from Athletico, Presence St. Joseph Hospital, Presence Resurrection, and Chicago Orthopaedics & Sports Medicine. In response, plaintiff argues that defendant misapprehends the foundational requirements for the admission of medical bills and that each of the witnesses satisfied these foundational requirements. The admission of medical bills into evidence does not require the testimony of a billing specialist, only someone with "knowledge of the services rendered and the usual and customary charges for such charges." *Klesowitch*, 2016 IL App (1st) 150414, ¶ 45. Plaintiff presented this requisite foundation for each of her medical providers.

¶ 74    Hardman was a compliance specialist for Athletico and oversaw the medical records department. She identified an exhibit consisting of an affidavit of records billing and various medical bills for plaintiff incurred at Athletico. She received the invoices in the regular course of business as a regularly conducted activity. The records were made at or near the time that services were provided to plaintiff and covered services between June 2018 and September 2018. According to Hardman, the charges for medical care were usual and customary for the medical services provided.

¶ 75    Similarly, Evans was a business analyst with Ascension Illinois and was familiar with the usual and customary medical charges for Presence Resurrection Medical Center and Presence Saint Joseph Hospital. She identified her signature on an affidavit of records which detailed an itemized statement of the services and charges for care rendered by the Presence providers for plaintiff in February 2018 and April 2018. These records are kept by Presence in the regular

course of a business as a regularly conducted activity and were transmitted to her in the regular course of business by someone with personal knowledge and the records were made at or near the time the services were provided.

¶ 76    Dr. Nam also identified bills from his practice, Chicago Orthopaedics & Sports Medicine, starting after January 17, 2018. The bills were for his treatment of plaintiff and were usual and customary for plaintiff's treatment.

¶ 77    Hardman, Evans, and Dr. Nam each testified that they were familiar with the medical bills as part of their normal course of business. They each had knowledge of the services provided and testified that the charges were usual and customary. Although the witnesses did not testify to the specific costs of plaintiff's treatments, their testimony established the requisite knowledge of the usual and customary charges for plaintiff's treatment. Therefore, the trial court did not abuse its discretion in denying defendant's motion *in limine* to admit plaintiff's medical bills.

¶ 78    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 79    Affirmed.