**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230566-U

Order filed June 12, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| GOODBERLET HOME SERVICES, INC., | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff and | ) | Kankakee County, Illinois, |
| Counterdefendant-Appellant, | ) | |
| | ) | Appeal No. 3-23-0566 |
| v. | ) | Circuit No. 18-L-89 |
| | ) | |
| FRANCIS P. GIRARD, JANET M. GIROUX, | ) | |
| and RICHARD J. GIRARD, | ) | |
| | ) | |
| Defendants, Counterplaintiffs, and | ) | |
| Third-Party Plaintiffs-Appellees | ) | |
| | ) | Honorable |
| (John M. Kilroy, Third-Party Defendant- | ) | Lindsay A. Parkhurst, |
| Appellant). | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hettel and Davenport concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's denial of plaintiff's motion to vacate the dismissal and reinstate its fifth amended complaint for breach of contract was not an abuse of discretion. The trial court's judgment in favor of counterplaintiffs/third-party plaintiffs on their breach-of-contract counterclaim/third-party claim was not against the manifest weight of the evidence. Affirmed.

¶ 2       The underlying case involved competing breach-of-contract claims arising out of the sale of Girard Electric, Inc., an electrical contractor and supply company, to Goodberlet Home Services, Inc. (Goodberlet), a heating, air conditioning, and home services company. Goodberlet was the plaintiff and counterdefendant. Siblings Francis P. Girard, Janet M. Giroux, and Richard J. Girard (collectively the Girards), each a one-third owner and corporate officer of Girard Electric, were the defendants, counterplaintiffs, and third-party plaintiffs. John M. Kilroy and Melanie Boehm, owners and corporate officers of Goodberlet, were the third-party defendants.[1]

¶ 3       However, after extensive motion practice, including the trial court's dismissal without prejudice of Goodberlet's fifth amended complaint as a discovery sanction, and the subsequent denial of Goodberlet's motion to vacate the dismissal and reinstate the fifth amended complaint, the only operative pleading was the Girards' breach-of-contract counterclaim/third-party claim against Goodberlet and Kilroy. Following a bench trial on the counterclaim/third-party claim, the trial court entered judgment in favor of the Girards and against Goodberlet and Kilroy in the amount of $739,659. Goodberlet and Kilroy appeal from the judgment on the counterclaim/third-party claim and from the denial of Goodberlet's motion to vacate the dismissal order and reinstate its fifth amended complaint. For the reasons set forth below, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5       We recount the parties' contract and relevant portions of the procedural history, trial proceedings, and the trial court's ruling.

¶ 6                                    A. Agreement

_____

[1]According to the parties' briefs, Boehm filed for bankruptcy in 2019 (leading to an automatic stay and discharge of the claim against her) and was not a party at trial or on appeal. Boehm is also referred to in the record with different last names.

¶ 7        Goodberlet and Girard Electric entered into a September 18, 2017, "AGREEMENT FOR SALE OF BUSINESS ASSETS" (agreement), pursuant to which Goodberlet purchased Girard Electric's assets. The assets set forth in the agreement included Girard Electric's: (1) personal property (itemized with a value in exhibit A by categories including "TOOLS IN SHOP AND TRUCK TOOLS," "EQUIPMENT," "VEHICLES," and "FURNITURE & DISPLAYS"); (2) inventory (itemized with a value in exhibit B by categories including "DISPLAY ITEMS," "STOCK ITEMS," and "SHOP TOOLS EQUIPMENT"); (3) accounts receivable; (4) customer files and records; (5) marketing and advertising contracts; (6) all rights, title, and interest in the company's name, website, contact information, intellectual property, and operational agreements; and (7) the goodwill of the business. Regarding the inventory, the agreement provided that the parties "recognize that the actual physical inventory will change from day to day after the execution of this Agreement but that the Purchasers are familiar with the inventory on an ongoing basis and will accept the inventory as of the closing date." The agreement also included a "WARRANTIES OF SELLER" section, pursuant to which Girard Electric warranted, *inter alia*, that all the books, records, and other financial data relative to the business that it provided were true, correct, and complete, and that, after execution of the agreement, it would not sell, dispose of, or in any manner encumber any of the assets sold (with exceptions not relevant here).

¶ 8        The agreed purchase price was $800,000; the agreement stated that this was the total of the values for fixtures, equipment, and motor vehicles ($206,650); inventory ($234,008); accounts receivable (the actual amount on the closing date); and goodwill (the difference between the purchase price and the sum of the other three categories). The agreement provided that $180,000 was due at closing, and the remaining $620,000 was payable at a 5% interest rate

in bi-monthly installments of $17,556, beginning November 18, 2017, and ending with a final balloon payment of $217,252 on September 18, 2022. The agreement further provided that Kilroy and Boehm were jointly and severally liable for Goodberlet's obligations under the agreement.

¶ 9    The signatories to the agreement were the Girards on behalf of Girard Electric and Kilroy and Boehm on behalf of Goodberlet and as personal guarantors of Goodberlet's obligations under the agreement. Contemporaneously with signing the agreement, Kilroy and Boehm also signed a promissory note in the amount of $620,000. The promissory note provided that, in the event of a default, the entire unpaid balance of the note and interest at an annual rate of 6% shall be immediately due and payable and that Kilroy and Boehm agreed to pay all costs of collecting or attempting to collect under the note, including reasonable attorney fees.

¶ 10    There were two stated conditions precedent to the agreement, which were also performed contemporaneously with the signing of the agreement. The first was that Goodberlet entered into a lease with the owner of the premises at which Girard Electric had been headquartered. The second was that Goodberlet and the Girards—individually and as owners and officers of Girard Electric—entered into a "Non-Competition/Non-Disclosure Agreement" (noncompete agreement). The noncompete agreement included provisions prohibiting the Girards, for the five-year time period following closing, from owning, managing, deriving benefit from, or being employed by a competing business within the defined geographic region and from soliciting any customers who had done business with Girard Electric in the 24 months preceding closing for any related business as described therein.

¶ 11    B. Procedural History

4

¶ 12    Goodberlet initiated this action on August 13, 2018, by filing a complaint against the Girards alleging breach of contract, fraud, and unjust enrichment and seeking a temporary and permanent injunction requiring the Girards to cease all work within the scope of the noncompete agreement. Goodberlet's central allegations were that the Girards published an advertisement in a local newspaper that gave the impression that Girard Electric had closed and that the Girards performed work and made statements in violation of the noncompete agreement.

¶ 13    The Girards moved to dismiss the complaint for failure to state a claim pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2018)). Goodberlet did not respond to the motion to dismiss but successfully moved for leave to file an amended complaint.

¶ 14    Thereafter, on February 1, 2019, and March 13, 2019, Goodberlet filed first and second amended complaints, respectively, but, following the filing of the Girards' section 2-615 motions to dismiss these complaints for failure to state a claim, Goodberlet conceded the motions and successfully requested leave to amend. On October 17, 2019, Goodberlet filed a third amended complaint, but the Girards again filed a motion to dismiss the complaint for failure to state a claim pursuant to section 2-615, which the trial court granted without prejudice on November 20, 2019. Goodberlet filed a fourth amended complaint on December 13, 2019, and the Girards once again moved to dismiss under section 2-615 for failure to state a claim, raising many of the same deficiencies identified in their motions to dismiss the prior iterations of the complaint. Goodberlet's counsel subsequently withdrew, and the Girards' motion to dismiss the fourth amended complaint remained pending for several months. Goodberlet retained new counsel, who, on August 6, 2020, was granted a 30-day extension of time to respond to the pending

5

motion to dismiss. However, Goodberlet again conceded the motion and successfully sought leave to file a fifth amended complaint.

¶ 15    On December 28, 2020, approximately two months after its due date, Goodberlet filed a fifth amended complaint against the Girards, raising a sole breach-of-contract claim. Goodberlet continued to assert violation of the noncompete agreement, alleging instances where the Girards contacted former customers and advised them to use another electrical service and instances where Richard Girard continued to service former customers and perform electrical work in competition with Goodberlet. In addition, Goodberlet alleged that, despite selling the rights to Girard Electric's name, logo, and phone number, the Girards used this information in an advertisement they placed in a local newspaper on or about September 30, 2017. According to Goodberlet, the advertisement gave the impression that Girard Electric had closed or that its successor was incompetent, and Goodberlet's officers and employees received numerous phone calls "about going out of business after the ad appeared." Goodberlet sought judgment for breach of contract in the amount of $500,000 (and attorney fees and costs incurred in enforcing the contract, as provided for in the agreement), alleging that the Girards' failure to abide by the noncompete agreement damaged Girard Electric's goodwill in that Girard Electric's revenue decreased by approximately $500,000 in the year after the sale. The Girards answered the fifth amended complaint and raised as an affirmative defense that Goodberlet's material breach of the agreement—failure to make the bi-monthly installment payments—precluded the claim.

¶ 16    Turning to the required installment payments, Goodberlet made the bi-monthly payments of $17,556 until January 18, 2019, but failed to pay the bi-monthly installment due on March 18, 2019, and thereafter failed to make all remaining payments, resulting in its payment of only $268,927 of the $800,000 purchase price. On April 16, 2019, and April 29, 2019, respectively,

6

Girard Electric sent Goodberlet, Kilroy, and Boehm a notice of default for nonpayment and a notice of acceleration of the remaining balance. There was no response to the notices. On May 22, 2019, the Girards filed a breach-of-contract counterclaim against Goodberlet and third-party claims against Kilroy and Boehm as personal guarantors of the debt. In their filing, the Girards did the following: (1) attached copies of the agreement and promissory note and set forth the payment terms; (2) alleged that the sale of the business closed on September 18, 2017, at which point Goodberlet began operating as Girard Electric and using its business assets; (3) asserted that Goodberlet, Kilroy, and Boehm failed to make the required payments; and (4) claimed that they were harmed by the breach in the amount of the unpaid balance and interest.

¶ 17    On August 6, 2019, Boehm and Kilroy filed answers to the third-party claims and asserted the affirmative defenses of mutual mistake, unilateral mistake, and fraud. In support of the affirmative defenses, they alleged that, unbeknownst to Kilroy and Boehm, the inventory attached to the agreement mistakenly listed items more than once, resulting in an inflated purchase price, and that the Girards did not inform Kilroy and Boehm that the Girards had "written off all the value [of the inventory] on their tax return." In support of the affirmative defense of fraud, Kilroy and Boehm further reiterated the allegations set forth in the complaint regarding violation of the noncompete agreement.

¶ 18    On September 11, 2019, the Girards moved to strike Kilroy's affirmative defenses for failure to state a claim pursuant to section 2-615 (Boehm had filed for bankruptcy at this point, automatically staying all claims against her), but, prior to any ruling on the motion, on October 17, 2019, Kilroy filed an amended answer and reasserted the affirmative defenses of mutual mistake, unilateral mistake, and fraud. On December 6, 2019, Goodberlet filed an answer to the counterclaim and asserted the affirmative defenses of mutual mistake and fraud based largely on

7

the same allegations pled in Kilroy's affirmative defenses and adding the allegation that there was a mutual mistake regarding the value of Girard Electric's goodwill. On December 18, 2019, the Girards moved to strike the affirmative defenses under section 2-615 for failure to state a claim. At the February 8, 2021, hearing on the motion to strike, counsel for Goodberlet and Kilroy conceded the motion to strike, leaving only the general denial set forth in their answer to the Girards' claims.

¶ 19        With respect to discovery, the Girards issued interrogatories and document requests to Goodberlet and Kilroy on March 3, 2021, seeking, *inter alia*, proof of damages resulting from the alleged violations of the noncompete agreement, as pled in the fifth amended complaint. Neither Goodberlet nor Kilroy responded to the discovery requests and subsequently failed to comply with the trial court's April 29, 2021, order granting the Girards' motion to compel production. As a result, following the Girards' petition for a rule to show cause why Goodberlet and Kilroy should not be held in contempt, the trial court ultimately entered an order on May 27, 2021, construing the petition as a motion for discovery sanctions under Illinois Supreme Court Rule 219 (eff. July 1, 2002), and sanctioning Goodberlet and Kilroy $500 each. The trial court also ordered the production of the requested discovery by June 10, 2021; however, neither Goodberlet nor Kilroy complied with the deadline nor paid the sanction. Thus, the Girards filed a motion for sanctions under Rule 219, which the trial court granted on June 24, 2021, assessing an additional $500 in sanctions and expressly admonishing Goodberlet and Kilroy that it would entertain a motion to dismiss the fifth amended complaint in the event of failure to comply with its order by July 8, 2021. Neither Goodberlet nor Kilroy complied with the deadline nor paid the sanction.

¶ 20    The Girards, in turn, filed a motion to dismiss the fifth amended complaint, impose additional monetary sanctions, and enter a default judgment on their counterclaim/third-party claim. On July 20, 2021, the trial court entered a written order granting the motion in part. The trial court dismissed the fifth amended complaint without prejudice and increased the sanctions by another $500, but the trial court denied the Girards' request for a default judgment on their counterclaim/third-party claim. In dismissing the fifth amended complaint and ordering additional sanctions, the trial court recounted Goodberlet's and Kilroy's repeated failure to comply with their discovery obligations, failure to comply with three court orders compelling responses to the Girards' discovery requests, and failure to pay the sanctions assessed against them pursuant to Rule 219. The trial court noted that, "[t]o date, Goodberlet and Kilroy have not provided any response, objection, or production of documents to [the Girards'] discovery requests that might support their claims." The trial court also noted its express June 24, 2021, warning that failure to comply with discovery and pay the sanctions could lead to dismissal of the fifth amended complaint. Following dismissal of Goodberlet's fifth amended complaint, the case proceeded on the Girards' counterclaim/third-party claim against Goodberlet and Kilroy.

¶ 21    However, Goodberlet and Kilroy failed to produce their required initial disclosures. The trial court ordered compliance, but Goodberlet and Kilroy failed to comply by the deadline. The Girards moved for sanctions under Rule 219, at which point Goodberlet and Kilroy tendered incomplete disclosures. In a December 13, 2021, order, the trial court again ordered sanctions against both Goodberlet and Kilroy in the amount of $500, finding their failure to comply with the court's directives "unexplained and unwarranted." Thereafter, the second attorney for Goodberlet and Kilroy withdrew, and new counsel subsequently appeared on their behalf.

9

¶ 22    On May 12, 2022, approximately 10 months after its fifth amended complaint had been dismissed without prejudice, Goodberlet filed its "Motion To Vacate Dismissal Order And Reinstate The Fifth Amended Complaint" (motion to reinstate), stating that, in late February 2022, it had paid the previously imposed sanctions and supplemented its initial disclosures. The motion and reply in support did not identify the procedural basis for the relief sought but cited case law involving the propriety of sanctions under Rule 219 as well as dismissals for want of prosecution. According to Goodberlet, dismissal of the fifth amended complaint exceeded the purpose of sanctions—to promote discovery, not punish a dilatory party. The Girards filed a response in opposition, noting the "nearly four years of broken deadlines and disregarded obligations by Goodberlet and Kilroy," including six iterations of the complaint, seven missed court dates, multiple sanctions for failure to comply with court orders, and inadequate production of discovery.

¶ 23    On August 31, 2022, following a hearing, the trial court[2] denied the motion to reinstate the fifth amended complaint. Characterizing the request as a petition for relief from judgment under section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2022)), the trial court found that Goodberlet failed to demonstrate due diligence in presenting its claim after "four years of delay, obstruction, and noncompliance in the original action." The trial court reasoned that "there's no factual allegations, no affidavits, no explanation of why there was a four year delay for noncompliance in presenting the original claim."

---

[2]At this point, Judge Lindsay A. Parkhurst had replaced Judge Adrienne W. Albrecht upon her retirement and before her assignment to the appellate court.

¶ 24    The ensuing trial proceeded only on the Girards' breach-of-contract counterclaim against Goodberlet and third-party claim against Kilroy for failure to pay the purchase price as set forth in the agreement.

¶ 25    C. Trial

¶ 26    At the March 2023, two-day bench trial on the Girards' claims, the Girards presented the testimony of Janet, Richard, and Larry Ohm—an accountant and certified business valuation specialist. Goodberlet and Kilroy presented the testimony of Kilroy. We summarize the relevant evidence.

¶ 27    Girard Electric had been a family business since 1935; siblings Janet, Richard, and Francis became the owners in 1972. Francis was the president; Richard was the vice-president; and Janet was the corporate secretary and treasurer.

¶ 28    Kilroy and Boehm purchased Goodberlet in 2014. Subsequently, in March 2017, they met with the Girards to discuss a potential acquisition of Girard Electric to expand Goodberlet's heating and air conditioning services through a complimentary business. While neither Kilroy nor Boehm had experience in the electrical business, Kilroy had a bachelor's degree and master's degree in business and worked in finance and sales during his professional career. Negotiations over the acquisition terms spanned the next 18 months. Kilroy testified that he conducted the diligence review and that Goodberlet requested Girard Electric's financial statements and tax returns. Janet testified that she provided Kilroy and Boehm with "[w]hatever they asked for" and never denied any request for information or documents. Specifically, pursuant to Goodberlet's request, Girard Electric provided its financial statements, tax returns, and itemized lists of the company's personal property and inventory (which, as discussed *supra*, were attached as exhibits to the agreement).

¶ 29 Regarding the inventory, Janet explained that the Girards physically counted the company's assets in late 2016 and provided Goodberlet an itemized list with an estimated price for each item. Richard testified that this was the first time that Girard Electric had inventoried its assets and explained the process it utilized. The company's secretary "took care of the showroom, counted everything, and the stock to back it up and then myself and my wife did all the rest," meaning the tools, material, trucks, and all the "back end." They recorded the items with descriptions on a legal pad and gave the information to Francis because "he did 95 percent of the pricing, and he purchased all that stuff so he knew, and then after he priced it, it went to the secretary and it was all typed up." Richard did not know when the items in the inventory were purchased, and Girard Electric did not keep records regarding the purchase dates. Richard understood that the inventory was conducted for purposes of a potential sale and that Goodberlet would rely upon the inventory. Janet testified that the Girards offered Goodberlet a site visit to inspect the property, that Boehm visited Girard Electric's facility, but that her physical inspection of the assets lasted less than three minutes.

¶ 30 During negotiations, the Girards retained Ohm to prepare a business valuation of Girard Electric. Ohm utilized two industry-accepted methodologies for business valuation: (1) the rule-of-thumb method in which he applied a multiplication factor to Girard Electric's discretionary earnings and added the inventory value, yielding a business valuation of $798,502; and (2) the excess-earnings method in which he calculated a $342,395 business valuation based upon Girard Electric's historical earnings over its discounted net asset values. Ohm testified that the higher value calculated by the rule-of-thumb method was a reasonable estimate of Girard Electric's value. He rejected as unreasonably low the excess-earnings valuation because it was less than the value of the company's combined assets and thus a price that no seller would rationally accept.

12

Nonetheless, Ohm included the valuations from both methodologies in his valuation, which was provided to Kilroy and Boehm in March 2017.

¶ 31    The report reflected an adjustment in the calculation of the value for inventory, from $174,000 to $237,000, to account for differences between the asset values reflected in Girard Electric's historical financial statements and higher asset values reflected in the 2016 inventory. Ohm testified that he did not inquire as to the reason for the difference, that such differences are not uncommon among businesses like Girard Electric, and that the difference did not cause him to suspect wrongdoing or misleading information in the company's financial information. Ohm also made an adjustment of $95,475 for the property and equipment based on information from the Girards. Ohm did not audit Girard Electric's financials and relied on the financial statements that the Girards provided. Janet testified that she understood the importance of providing true and accurate financial information to Ohm and Goodberlet.

¶ 32    Kilroy testified that he spoke with Ohm about the valuation. They reviewed the methodology, and, while Kilroy thought it was a fair way to appraise the business, Kilroy inquired about the adjustments. Ohm responded that he received the numbers from Janet and made the adjustments accordingly. Kilroy testified that he believed that the adjustment to inventory was based on a second inventory having been done.

¶ 33    In a March 30, 2017, e-mail from Kilroy to Janet, Kilroy advised, "I was able to review the valuation report with Larry Ohm and how the business value and adjusted Shareholder Equity are calculated." Noting in the e-mail that "[w]e discussed the items listed from your physical inventory sheet" and the adjustments made and that "[t]he value of the business is the $798,502 including goodwill," Kilroy requested a meeting to discuss an agreeable purchase price and payment structure. In response to whether he negotiated for a reduction in the purchase price

13

after learning of the adjustment to inventory, Kilroy testified, "We did and they were firm on the 800 and felt—and you know, we discussed it and felt like we would go ahead and, you know, pay a little more [and] we could still make our loan payments." In response to whether he audited any portion of the asset list or took "a special look at any particular section of the items" that he might be purchasing, Kilroy responded, "The vehicles and, you know, I was concerned that we were overpaying for the vehicles on—$18,000 for a 1992 truck that didn't work. You know, that—other things would seem like they were a little bit higher than they should be, but we accepted it," and this led to a decision that $800,000 would be a fair purchase price for Girard Electric.

¶ 34    With respect to the agreed purchase price of $800,000—with its values for fixtures, equipment, and motor vehicles ($206,650); inventory ($234,008); accounts receivable (the actual amount on the closing date); and goodwill (the difference between the purchase price and the sum of the other three categories), Kilroy testified that Goodberlet did not independently investigate the accuracy of the numbers because Goodberlet did not have the experience to do that. Kilroy testified that he did not understand "the value of the parts they had or how old they were" or what "the inventory numbers were based on, if it was original cost, depreciated cost." Rather, he trusted the documents provided by the Girards and "all the numbers that they had provided" in agreeing to the purchase price, noting the agreement's warranty provision, whereby Girard Electric warranted that all the books, records, and other financial data relative to the business that it provided were true, correct, and complete.

¶ 35    Kilroy also testified that Girard Electric's goodwill held significant value to Goodberlet because Girard Electric was reputable and had been in business for 82 years. Kilroy explained that it "was a huge value to us to have that reputation and to be able to carry on, you know, sales

14

at at least the same level as they had previously." Regarding goodwill, although the parties' agreement valued goodwill as the difference between the purchase price and the sum of the other three categories, Janet testified that, at some prior point, she had requested Girard Electric's accountant to prepare an estimate of the company's goodwill and that, as of September 30, 2015 (two years before the sale of Girard Electric to Goodberlet), the estimate of Girard Electric's goodwill was $438,088. Kilroy also testified regarding the significance of the noncompete agreement in that "the value in the business was the Girards." Thus, Goodberlet would not have proceeded with the purchase absent the noncompete agreement.

¶ 36    The parties came to an agreement on the purchase prices and other terms and retained counsel to negotiate final terms and draft the agreement. On September 1, 2017, Goodberlet's counsel requested a copy of the schedule of inventory assets. The Girards' counsel responded by sending a copy of the inventory that had been given to Goodberlet "several months ago." Kilroy testified that he had expected an updated inventory list. The parties closed on the sale on September 18, 2017. Immediately after the closing, the Girards turned over the business and its assets to Goodberlet. Goodberlet began operating as Girard Electric in the company's longtime headquarters and began doing business with Girard Electric's customers.

¶ 37    Kilroy testified regarding the newspaper advertisement that Goodberlet ran in a local newspaper shortly after the closing. The advertisement—admitted as an exhibit at trial—stated, "IT'S TIME FOR A CHANGE" and that "AFTER 82 YEARS of serving our community…we are retiring." The advertisement further advised that, "All of your lighting and electrical needs can still be found at the Kankakee location, and you will find some familiar faces to help you make your house a home." It concluded, "Thank you for being such an important part of our

15

story," and was noted to be from "Fran, Rich & Janet Girard-Giroux." Girard Electric's name, logo, address, and phone number was included at the bottom of the advertisement.

¶ 38 Kilroy testified that the advertisement made it sound like Girard Electric was going out of business. He called Janet to find out "what's going on," and Janet responded that they wanted to thank their customers. After Kilroy pointed out that she used the company name and logo that Goodberlet had just purchased, Janet apologized. On October 5, 2017, Goodberlet's attorney sent a letter to the Girards' attorney advising that the advertisement had violated the terms of the agreement and that, while he did "not have a specific request as to a cure or remedy at the moment, [] it is something that needs to be addressed in some fashion." Goodberlet's attorney also requested the Girards' attorney to advise the Girards to cease and desist use of the Girard Electric name, logo, or other proprietary information. Goodberlet did not receive a response to the letter.

¶ 39 Kilroy testified that Goodberlet lost business as a result of the advertisement. When questioned as to the supporting evidence for this claim, Kilroy testified that there was a 46% decrease in sales from the prior year for Girard Electric. However, he acknowledged that he could not say that this was definitely the result of the advertisement but "just partially." Kilroy further testified that, following closing, Goodberlet determined that Girard Electric's inventory was "mostly junk" and its value "dramatically overstated." Thus, Goodberlet "wrote off over $200,000 on our 2017 tax return." In addition, Kilroy testified that Goodberlet recovered a "minimal" amount of Girard Electric's accounts receivable, stating that "[t]hey were very aged accounts receivable."

¶ 40 Goodberlet made the required bi-monthly payments of $17,556 until January 18, 2019. Goodberlet failed to pay the bi-monthly installment due on March 18, 2019, and thereafter failed

16

to make all remaining payments, resulting in its payment of only $268,927 of the $800,000 purchase price. On April 16, 2019, and April 29, 2019, respectively, Girard Electric sent Goodberlet, Kilroy, and Boehm a notice of default for nonpayment and a notice of acceleration of the remaining balance. There was no response to the notices.

¶ 41    Following the close of evidence, the parties submitted written closing arguments, and the trial court took the matter under advisement.

¶ 42                                    D. Ruling

¶ 43    On September 27, 2023, the trial court issued a written order, entering judgment in favor of the Girards and against Goodberlet and Kilroy, finding that the Girards met their burden of establishing the elements of the breach-of-contract counterclaim/third-party claim. First, the trial court found the agreement to be a valid and enforceable contract. "The evidence showed there was an appropriate diligence period; all information requested by Goodberlet and/or Kilroy was provided by Girard; Girard provided a certified valuation of price; and there were negotiations where Goodberlet and Kilroy used the valuation provided by Girard to reduce the selling price." The court also noted that the validity of the promissory note signed by Kilroy and Boehm was undisputed. Second, the trial court found that the parties performed under the agreement. Namely, after the closing, Girard Electric turned over the business to Goodberlet, including conveying all records, receivables, equipment, inventory, keys, customer lists, and other assets, and, in turn, Goodberlet took control of the business assets, including collecting on receivables, marketing itself with the Girard Electric name, engaging preexisting Girard Electric customers, and making semi-monthly payments pursuant to the agreement's terms.

¶ 44    Third, the trial court found that Goodberlet and Kilroy breached the agreement by failing to make payments pursuant to its terms. Goodberlet made the required bi-monthly payments of

17

$17,556 until its final payment on January 18, 2019. Goodberlet failed to pay the bi-monthly installment due on March 18, 2019, and thereafter failed to make all remaining payments, resulting in its payment of only $268,927 of the $800,000 purchase price. In compliance with the agreement's default provision, Girard Electric sent Goodberlet and Kilroy notice of nonpayment and notice of acceleration of the remaining balance. Neither Goodberlet nor Kilroy responded to the demand letters. Finally, the trial court found that the Girards were harmed by the breach in that they were owed the unpaid balance of $531,073 plus interest at the default interest rate of 6%—$160,631 as of May 3, 2023. In addition, pursuant to the promissory note's default provision, the Girards were entitled to their reasonable attorney fees and costs in the amount of $22,758 and $1,963, respectively, based upon the undisputed evidence at trial.

¶ 45      The trial court proceeded to note that Goodberlet's and Kilroy's only responsive pleading was an answer with a general denial of the counterclaim and that they no longer had a pending complaint nor affirmative defenses on file. Accordingly, the trial court found that Goodberlet and Kilroy "waived any affirmative defenses and also waived the grounds or defenses, whether affirmative or not, related to Goodberlet and Kilroy's failure to perform under the contract because such defenses are not pleaded in any pleading pending with the court and such defenses are not contained or stated in the Answer to the Counterclaim." The trial court further found that Goodberlet and Kilroy raised defenses regarding asset valuation and diligence for the first time during trial, causing surprise to the Girards. Thus, the trial court reasoned that, "even if the evidence suggests (which this court believes it does not) the existence of any of the defenses argued at bench trial, the defenses are deemed waived because they were not properly pled as required by 2-613(d)." See 735 ILCS 5/2-613(d) (West 2022) ("The facts constituting any affirmative defense *** and any defense which by other affirmative matter seeks to avoid the

18

legal effect of or defeat the cause of action set forth in the complaint, counterclaim, third-party complaint, in whole or in part, and any ground or defense, whether affirmative or not, which, if not expressly stated in the pleading, would be likely to take the opposite party by surprise, must be plainly set forth in the answer or reply.").

¶ 46 The trial court then entered judgment in favor of the Girards and against Goodberlet and Kilroy in the amount of $716,425 (the total of the unpaid balance, interest, and attorney fees and costs). The trial court subsequently granted the Girards' motion to supplement the judgment order with additional accrued interest and attorney fees, thereby increasing the total judgment award to $739,659. Goodberlet and Kilroy filed a timely notice of appeal, challenging the trial court's denial of its motion to vacate the dismissal order and reinstate the fifth amended complaint and the trial court's judgment on the counterclaim/third-party claim. For ease of reference, we refer to Goodberlet and Kilroy collectively as Goodberlet with respect to their arguments on appeal and to the counterclaim/third-party claim as simply the counterclaim.

¶ 47                                    II. ANALYSIS

¶ 48 Goodberlet argues on appeal that the trial court erred in analyzing its motion to reinstate the fifth amended complaint pursuant to the framework for a section 2-1401 petition, rather than properly considering the motion under Rule 219. Goodberlet also challenges the trial court's finding in favor of the Girards on their breach-of-contract counterclaim, arguing that the Girards failed to meet their burden of proving compliance with their obligations under the agreement. We address each argument in turn.

¶ 49                    A. Denial of Motion to Reinstate the Fifth Amended Complaint

¶ 50 Goodberlet challenges the trial court's reliance upon section 2-1401 in resolving Goodberlet's motion to reinstate the fifth amended complaint. Initially, we agree that section 2-

19

1401 is not applicable here. Section 2-1401 provides a comprehensive statutory mechanism by which a *final* order or judgment in a civil or criminal case may be vacated or modified more than 30 days, but not more than two years, after its entry. See 735 ILCS 5/2-1401 (West 2022); *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 31. The trial court's July 20, 2021, dismissal of the fifth amended complaint was *without* prejudice and therefore not a final order. See *Village of Orion v. Hardi*, 2022 IL App (4th) 220186, ¶ 19 (an order dismissing a complaint without prejudice is generally not considered final). However, we may affirm a trial court's judgment on any ground supported by the record. *Bank of America, N.A. v. Luca*, 2013 IL App (3d) 120601, ¶ 14. Here, as set forth below, there was ample evidence in the record to support the denial of Goodberlet's motion.

¶ 51    Goodberlet argues that the trial court should have analyzed its request to vacate the dismissal order and reinstate its fifth amended complaint pursuant to Rule 219. Rule 219 addresses the consequences of a party's refusal or failure to comply with rules or court orders relating to discovery. Ill. S. Ct. R. 219 (eff. July 1, 2002); *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998). Rule 219(c) sets forth a nonexhaustive list of possible sanctions, including "[t]hat, as to claims or defenses asserted in any pleading to which that issue is material, a judgment by default be entered against the offending party or that the offending party's action be dismissed with or without prejudice." Ill. S. Ct. R. 219(c)(v) (eff. July 1, 2002). The trial court weighs multiple factors when imposing sanctions, including the surprise and prejudice to the nonoffending party and the offending party's good faith in failure to comply with the discovery rules. *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 121. A trial court's imposition of a particular sanction will be reversed only where there has been a clear abuse of

20

discretion, which occurs when its decision is unreasonable, arbitrary, or where no reasonable person would adopt the same view. *Id.*

¶ 52    Here, after Goodberlet's and Kilroy's repeated noncompliance with discovery, disregard of court orders, and nonpayment of monetary sanctions, the Girards filed a motion seeking, *inter alia*, dismissal of the fifth amended complaint. The trial court had expressly admonished Goodberlet and Kilroy, in its June 24, 2021, order, that it would entertain this request if they did not comply with their discovery obligations and pay the previously imposed sanctions. In its July 20, 2021, written order granting the Girards' motion, the trial court detailed Goodberlet's and Kilroy's repeated failure to comply with their discovery obligations, failure to comply with three court orders compelling responses to the Girards' discovery requests, and failure to pay the sanctions assessed against them pursuant to Rule 219, adding that, "[t]o date, Goodberlet and Kilroy have not provided any response, objection, or production of documents to [the Girards'] discovery requests that might support their claims."

¶ 53    Notably, on appeal, Goodberlet does not challenge the July 20, 2021, order or assert that the initial dismissal of the fifth amended complaint was unwarranted. Indeed, Goodberlet acknowledges its problematic conduct, recognizing on appeal that "it should have complied with discovery earlier." However, Goodberlet contends that the trial court's subsequent denial of its request to vacate the dismissal order and reinstate the fifth amended complaint contravenes the principle that sanctions should be tailored to promote discovery, not punish a dilatory party. See *Inman*, 2019 IL App (1st) 172459, ¶ 121 (while sanctions serve the dual purpose of combatting abuse of the discovery process and maintaining the integrity of the court system, sanctions should be tailored to promote discovery, not punish a dilatory party). According to Goodberlet, because it ultimately remedied its deficient discovery and paid the sanctions, the trial court

21

abused its discretion in denying the motion to vacate the dismissal and reinstate the fifth amended complaint. We disagree.

¶ 54    Simply put, the record reflects that Goodberlet repeatedly ignored their discovery obligations and defied deadlines set by the court, as well as orders to pay sanctions, leading up to the dismissal of its fifth amended complaint. This unwarranted and repeated disregard of its discovery obligations was compounded where Goodberlet waited several more months before it made any effort to remedy its noncompliance with discovery and 10 months before it sought reinstatement of the fifth amended complaint. There was never any reasonable excuse or explanation offered at trial or on appeal for the initial or subsequent delays. See *In re Estate of Andernovics*, 197 Ill. 2d 500, 510 (2001) ("A party disputing a sanction order for failure to comply with discovery must establish that noncompliance was reasonable or justified under the circumstances."). Under these circumstances, the trial court was well within its discretion in refusing to reinstate the fifth amended complaint. While the trial court incorrectly considered this noncompliance in the context of section 2-1401's due diligence framework, its ultimate decision not to reinstate the complaint in the context of all that transpired, including the post-dismissal delay, was not an abuse of discretion. See *Bank of America*, 2013 IL App (3d) 120601, ¶ 14 (we may affirm a trial court's judgment on any ground supported by the record).

¶ 55    Goodberlet maintains that public policy favors the determination of controversies according to the parties' substantive rights. See 735 ILCS 5/1-106 (West 2022) (the Code "shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties"); *Christian v. Lincoln Automotive Co.*, 403 Ill. App. 3d 1038, 1042 (2010) ("public policy in Illinois favors determining controversies according to the substantive rights of the parties"). However, this general proposition of law does not

22

provide a basis for reversal. Indeed, "[w]here it becomes apparent that a party has willfully disregarded the authority of the court, and such disregard is likely to continue, the interests of that party in the lawsuit must bow to the interest of the opposing party." *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 69 (1995). Having reviewed the entirety of the record, involving not just repeated noncompliance with discovery obligations, but also a flagrant failure to comply with numerous court deadlines and orders to pay sanctions, we cannot say that the trial court's denial of Goodberlet's motion to vacate the dismissal and reinstate the fifth amended complaint was unreasonable, arbitrary, or that no reasonable person would adopt the same view. Accordingly, the trial court did not abuse its discretion in denying the motion.

¶ 56                                    B. Breach of Contract

¶ 57        Next, Goodberlet challenges the trial court's judgment in the Girards' favor on the breach-of-contract counterclaim. The elements of a breach-of-contract claim are a valid and enforceable contract, performance by the plaintiff, breach of the contract by the defendant, and injury to the plaintiff resulting from the breach. *Sherwood Commons Townhome Owners Ass'n v. DuBois*, 2020 IL App (3d) 180561, ¶ 28. The interpretation of a contract presents a question of law and is therefore reviewed *de novo*. *Id.* However, the trial court's findings as to the party's performance under the contract and the occurrence of a breach involve questions of fact and will not be disturbed on appeal unless the finding was against the manifest weight of the evidence. See *id.* (occurrence of breach); *LB Steel, LLC v. Carlo Steel Corp.*, 2018 IL App (1st) 153501, ¶ 37 (performance). Likewise, the standard of review following a bench trial is whether the trial court's judgment is against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). A judgment is against the

23

manifest weight of the evidence when the opposite conclusion is apparent or when the findings are unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 58        Goodberlet challenges the trial court's finding that the Girards met the performance element of the breach-of-contract counterclaim. We disagree. The trial court carefully reviewed the evidence and found that the Girards performed their obligations under the agreement. Namely, the Girards turned over the business to Goodberlet, including conveying all of Girard Electric's records, receivables, equipment, inventory, keys, customer lists, and other assets. In turn, Goodberlet took control of Girard Electric's assets and began operating as Girard Electric yet ultimately failed to make the required payments pursuant to the terms of the agreement.

¶ 59        Goodberlet maintains that the Girards failed to establish fulfillment of their warranty obligations under the agreement, including that: (1) the financial data it furnished during negotiations was true, correct, and complete; and (2) after execution of the agreement, it would not sell, dispose of, or in any manner encumber any of the assets sold. However, the Girards presented Ohm's testimony regarding the business valuation as well as Janet's and Richard's testimony regarding the inventory process, the information they supplied during negotiations, and the transfer of Girard Electric's assets to Goodberlet. Goodberlet does not identify the deficiency in the evidence that the Girards presented.

¶ 60        Rather, Goodberlet retreats to the same assertions raised in its fifth amended complaint and in Goodberlet's and Kilroy's affirmative defenses—that the Girards overstated the value of Girard Electric's inventory and accounts receivable and that the Girards' advertisement in the local newspaper following closing amounted to a failure to transfer Girard Electric's goodwill. Goodberlet argues that these were matters on which the Girards had the burden of proof as part of the burden to establish their performance under the agreement, specifically their fulfillment of

24

the above-stated warranty obligations. This argument is illogical. The fifth amended complaint had been dismissed as a discovery sanction, and the affirmative defenses were ultimately abandoned following motions to strike. Goodberlet's and Kilroy's only responsive pleading at the time of trial was an answer with a general denial of the counterclaim. As such, distilled, Goodberlet's position is that, encompassed within the Girards' burden to establish performance under the terms of the agreement, was a burden to *disprove* a nonexistent breach-of-contract claim and nonexistent affirmative defenses. Had Goodberlet and Kilroy properly raised their claims and defenses, they would have had the burden of proof. Certainly, their *failure* to properly raise them cannot eliminate or otherwise shift the burden of proof.

¶ 61     Moreover, regardless of the defunct nature of Goodberlet's and Kilroy's breach-of-contract claim and affirmative defenses, as Goodberlet asserted in its brief (in arguing that the Girards were not prejudiced by the discovery delays), "the same evidence was generally required whether or not Goodberlet may pursue its own claims, rather than merely defend against [the Girards'] breach of contract allegations." However, the only evidence that Goodberlet offered at trial to contest the asset valuation was Kilroy's testimony that Girard Electric's inventory was "mostly junk," that Goodberlet "wrote off over $200,000 on our 2017 tax return," and that Goodberlet recovered a "minimal" amount of Girard Electric's "very aged" accounts receivable. Goodberlet did not present any independent estimate of the value of Girard Electric's assets, any documentation of the write-off, or even the assets to which it applied. In addition, the newspaper advertisement was introduced at trial, but Goodberlet presented no evidence, other than Kilroy's testimony regarding a general decline in company revenues, to support the alleged damaging nature of the newspaper advertisement or how it impacted any particular customers or potential

25

business. We further note that Goodberlet does not identify any supporting evidence in this regard that it was precluded from presenting at trial.

¶ 62    Ultimately, the trial court considered the above-referenced evidence and found that the evidence did not support Goodberlet's assertions. As the trial court observed, "[t]he evidence showed there was an appropriate diligence period; all information requested by Goodberlet and/or Kilroy was provided by Girard; Girard provided a certified valuation of price; and there were negotiations where Goodberlet and Kilroy used the valuation provided by Girard to reduce the selling price." We also observe that the evidence established that Kilroy discussed the asset valuations and adjustments with Ohm, understood the issues, and, rather than contest the estimated pricing in the inventory, raised the issue as a point of negotiation in attempting to reduce the purchase price. Indeed, the agreement explicitly provided that the parties "recognize that the actual physical inventory will change from day to day after the execution of this Agreement but that the Purchasers are familiar with the inventory on an ongoing basis and will accept the inventory as of the closing date." Accordingly, Goodberlet presents no persuasive basis upon which to challenge the trial court's finding that the Girards established the elements of their breach-of-contract counterclaim.

¶ 63    As a final matter, Goodberlet relies upon the "first-to-breach" rule, which excuses a party's duty to perform under the contract if the other party materially breaches the agreement first. *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770. ¶ 50. According to Goodberlet, the Girards materially breached the contract because "the assets Goodberlet purchased were worth far less than represented by the Girards," and therefore, Goodberlet and Kilroy were excused from making the required payments under the agreement. However, again,

26

Goodberlet had no breach-of-contract claim; the fifth amended complaint (which did not raise a claim with respect to asset valuation in any event) had been dismissed.

¶ 64    Moreover, Goodberlet fails to appreciate the scope of the "first-to-breach" rule and our supreme court's decision in *PML Development*. Namely, where the injured party elects to continue performance after the other party materially breached the contract, this election converts the material breach to a "partial" breach of contract, and the injured party cannot suspend performance later and then claim it had no duty to perform based on the first material breach. *Id.* ¶¶ 51-52. Rather, the injured party may sue for damages caused by the partial breach but, " 'having elected to keep the contract in force, the injured party must continue to perform the contract on pain of likewise incurring liability for a breach.' " *Id.* ¶ 52 (quoting *Dustman v. Advocate Aurora Health, Inc.*, 2021 IL App (4th) 210157, ¶ 38).

¶ 65    Here, the record reflects that Goodberlet continued making payments pursuant to the agreement long after the events giving rise to its host of allegations. Thus, contrary to Goodberlet's bald assertion that it was entitled to suspend payments based on the "first-to-breach" rule, the Girards' alleged breach, even if an operative claim and even if it had been proven, did not eliminate Goodberlet's liability for breach of the agreement. In sum, the trial court's judgment in the Girards' favor on the breach-of-contract counterclaim and third-party claim against Goodberlet and Kilroy was not against the manifest weight of the evidence.

¶ 66                                III. CONCLUSION

¶ 67    The judgment of the circuit court of Kankakee County is affirmed.

¶ 68    Affirmed.

27